309 Ga. 529
FINAL COPY

S20A0859. YOUNG v. THE STATE.

WARREN, Justice.

Jermaine Young was convicted of malice murder in connection with the shooting death of Shane Varnadore.[1] Young now appeals, arguing that the trial court erred in denying Young's motion to suppress his statements made during police interviews, that the trial court erred in admitting a Facebook photo into evidence at trial,

---

[1] Varnadore was killed on March 1, 2016. On May 26, 2016, a Gwinnett County grand jury indicted Young and Reginald Lofton for malice murder, felony murder predicated on armed robbery, felony murder predicated on aggravated assault, armed robbery, and aggravated assault. Young and Lofton were tried separately, and this Court recently decided Lofton's appeal in *Lofton v. State*, ___ Ga. ___ (___ SE2d ___) (2020). On May 17, 2018, a Gwinnett County jury found Young guilty on all counts, and the trial court sentenced Young to life in prison without the possibility of parole for malice murder; concurrent terms of life in prison without the possibility of parole for each felony murder count; a concurrent term of life in prison for armed robbery; and a 20-year concurrent term for aggravated assault. Young timely filed a motion for new trial, which he amended through new counsel. After a hearing, the trial court denied the motion on November 4, 2019. In its order denying Young's motion, the trial court also modified Young's sentence, vacating both felony murder counts by operation of law and merging the aggravated assault count into the malice murder count. Young timely filed a notice of appeal, and the case was docketed in this Court for the term beginning in April 2020 and orally argued on June 16, 2020.

and that Young's trial counsel provided constitutionally ineffective assistance. For the reasons that follow, we disagree and affirm Young's convictions.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On March 1, 2016, Varnadore, who was working the closing shift at Papa John's, responded to a call to deliver two pizzas, two dessert pizzas, and a two-liter bottle of Pepsi to "Josh" in Unit 10108 at the Wesley Herrington Apartment Complex. The phone number used to place the order — later discovered to be associated with a TracFone — had called Papa John's three times that evening: once to inquire about pizza specials, once to place an order, and once to check on the status of the delivery. While Varnadore was delivering the order at approximately 11:30 p.m., he was shot in the chest at the apartment complex. Police responded to the scene and discovered Varnadore lying in a parking space in front of the apartment complex's 10000 building, where Unit 10108 is located. Police also found a spent .40-caliber shell casing two parking spots away from Varnadore's body

and an empty Papa John's insulated pizza-delivery bag and a two-liter bottle of Pepsi on the ground outside of Unit 10108.

After responding to the scene, detectives obtained the phone number used to call Papa John's. Through database searches, they linked Malek Buckley to the TracFone and discovered that Buckley lived in Unit 9301 of the Wesley Herrington Apartment Complex. And through Facebook, detectives learned that Buckley was friends with Young and uncovered Young's phone number. Phone records revealed that Varnadore had called the TracFone at 11:27 p.m. and that the TracFone then called Young's phone number at 11:34 p.m.

Police obtained a search warrant for Unit 9301, and on March 2, 2016, police executed the search warrant with assistance from SWAT. All five of the unit's residents — Reginald Lofton, Buckley (Lofton's half-brother), Porsha Porter (Lofton's older half-sister), Ciara Harris (Porter's girlfriend), and Young — were present when SWAT arrived. They all exited the apartment and were transported to police headquarters to be interviewed. During the search of Unit 9301, police found the TracFone associated with the number that

called Papa John's; pizza boxes delivered by Varnadore, as evidenced by the phone number and address on the receipts that were on the boxes; and what was later identified by a firearms examiner as the murder weapon hidden inside a box of pancake mix.

At trial, the medical examiner testified that Varnadore died from a gunshot wound to the torso.  Porter testified that on the night of the incident, Lofton discussed ordering a pizza; later that night while she was in bed, Porter heard a gunshot.  When she entered the living room shortly after, she saw Young on the couch, "[l]eaning sideways, like he was like out of breath."  Then, she "stepped outside" of the apartment and saw Lofton "com[e] up the stairs with his headphones on" and "walk[ ] in [to the apartment] with the pizza" before she "locked the door and went back in [her] room and went back to sleep."

Harris "came [out of the bedroom] just a little bit after" Porter and testified that she saw pizza boxes "[s]tacked . . . on top of the corner of the [kitchen] countertop" and that Lofton was in the kitchen and Young was on the couch when she walked out.  She also

testified that she was outside when she saw SWAT arrive at the apartment complex. After seeing SWAT, she "ran back inside" the apartment and "told everybody." Harris testified that the apartment turned into a "chaotic scene," with everyone "sh[a]ken up" and "moving fast" "all over the place." She saw Young grab a box of pancake mix and go into a room with it and saw Lofton put one of the pizza boxes under her bed.

Detective Matthew Kenck, the lead detective on the case, testified that during Buckley's police interview, Buckley stated that on the night of the shooting, "Young had woken him up, and then [Buckley] said that [Young] and [Lofton] had told him" "that they had hit a lick on the pizza man."[2] Young's three video-recorded interviews with Detective Kenck were then played for the jury. In the interviews, Young explained that he was visiting from Chicago and had been living with Porter for months. He stated that he had tried to return to Chicago on March 1, but missed the bus, so he was

---

[2] Detective Kenck testified that "hitting a lick" is a slang term for robbing someone and that, "if I remember correctly . . . [Buckley] specifically told me that a lick was, in this case, referring to a robbery."

planning on catching the bus to Chicago on March 2. During the interviews, Young eventually admitted that Lofton had made a plan to rob the pizza delivery person. Young also stated during the interviews that he had agreed to participate in the robbery and walked to the 10000 building with Lofton to assist him in the robbery but he claimed that he then abandoned the plan at the last minute, shortly before Varnadore was shot. Young explained that he ran back to Unit 9301 after Varnadore arrived at the apartment complex but before Varnadore was shot.

Young does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Young guilty beyond a reasonable doubt of the crimes for which he was convicted.[3] See *Jackson v.*

---

[3] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the

*Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979);

*Lofton v. State*, ___ Ga. ___, ___ (___ SE2d ___) (2020).  See also

OCGA § 16-2-20.

2.  Young argues that the trial court erred by denying his motion to suppress the statements he made during his police interviews.  Specifically, Young argues that his statements should have been excluded because (a) Young never knowingly waived his rights under *Miranda*[4] because he was misinformed about his "immediate right to a free lawyer" and because (b) detectives continued Young's interrogation after Young invoked his right to silence.

After the search warrant was executed on Unit 9301 on March 2, 2016, Young was handcuffed, taken to police headquarters to be interviewed by Detective Kenck and Detective Shannon Kulnis, and

---

term of court that begins in December 2020.  See *Davenport v. State*, ___ Ga. ___, ___ (___ SE2d ___) (2020).  The Court began assigning cases to the December Term on August 3, 2020.

[4] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

interviewed three times. At the outset of Young's first interview, the detectives informed Young that there were no outstanding warrants for his arrest, but that they were going to "read [him his] rights." Young interjected, asking whether he was "charged with anything," and the detectives told Young that he was not. The detectives then advised Young of his rights under *Miranda*. After Young indicated that he understood his rights, the following exchange occurred:

> YOUNG: So if I ask for a lawyer, y'all gonna — um — get a lawyer for me?
> DETECTIVE KENCK: Not today. No, I don't have access to a lawyer.
> YOUNG: So that means I would have to wait until y'all found a lawyer — until y'all can come talk to me or some s*** like that?
> DETECTIVE KENCK: Pretty much.
> YOUNG: So how long that could take?
> DETECTIVE KENCK: I mean, we, you know — you're not being charged with anything, so there — we don't — you get appointed with a lawyer when you're charged with something, so if you said you wanted a lawyer, and you wanted to go get one and come back and talk to us, that's — that's up to you.
> . . .
> DETECTIVE KENCK: So are you, uh — obviously, you mentioned a lawyer. You understand all of your rights? What they are? Do you want to talk to me without a

lawyer?
YOUNG: Just talk, let's see what you got to say.

In that first interview, Young denied any involvement in the incident.

Approximately five hours later, Young was interviewed a second time, and he indicated that he still understood his rights under *Miranda* when asked by Detective Kenck.[5] In that interview, Young stated that he had agreed to assist Lofton in robbing the pizza delivery person but claimed that he then changed his mind and walked away from the scene right before Varnadore was shot. At some point during the second interview, when explaining his role in the crimes, Young paused, looked at one of the detectives, and stated: "I'm done talking to you. If y'all find this s*** so funny, I'm done talking." The detectives explained that they thought it was "funny" because Lofton had given the detectives the same account of that evening's events during his interview, but with an important contradiction about who shot Varnadore: whereas Young told

---

[5] In the time between Young's first and second interviews, the detectives interviewed the other residents of Unit 9301.

detectives that *Lofton* was going to pay for the pizza and Lofton was the one who shot the pizza delivery person, Lofton told detectives that he believed *Young* was going to pay for the pizza and that Young was the one who pulled the trigger. Detective Kulnis elaborated: "Dude, you have to understand that when we catch two people telling us some bulls***, but it's the same bulls***, it's kinda funny." Soon after, Young asked, "Is you gonna listen to my story, or are you gonna just tell me what you think you know?" After detectives stated that they would listen to Young's version of events, Young continued to speak with them.

Almost immediately after the detectives exited the room at the conclusion of the second interview, Young requested to speak to the detectives again. A third interview ensued, and Sergeant Millsap replaced Detective Kenck in the interview room. In that interview, although Young maintained that he did not ultimately participate in the robbery, he admitted his further involvement in the initial robbery plan and provided more detail about the scheme to rob the pizza delivery person.

Before trial, the trial court conducted a hearing on Young's suppression motion and found that Young's "*Miranda* rights were properly given and that [Young] knowingly, willingly, and voluntarily waived the rights that he had to speak with the police." With regard to Young's argument that he invoked his right to silence during the second interview, the trial court found "the entire statement to be admissible."

In its order denying Young's motion for new trial, the trial court, "[h]aving reviewed the totality of the circumstances," affirmed its pretrial ruling regarding "the commentary surrounding [Young's] right to counsel" and Young's "purported invocation of his right to silence." The trial court concluded that the detectives "properly explained [Young's] right to counsel" and that Young "knowingly waived his right to counsel, and did so of his own volition." The trial court further concluded that Young's statements about being "'done talking'" "did not amount to a[n] 'unequivocal and unambiguous' statement that [Young] no longer wished to continue the interview with detectives."

(a) Young argues that he did not knowingly waive his rights under *Miranda* because Detective Kenck misled him about his right to an attorney by saying that Young was only entitled to an appointed lawyer once charged with a crime.[6] We disagree.

A defendant may waive his rights under *Miranda*, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (86 SCt 1602, 16 LE2d 694) (1966). "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Williamson v. State*, 305 Ga. 889, 893 (827 SE2d 857) (2019) (citation and punctuation omitted). "A statement by an interrogating agent that contradicts the *Miranda* warnings is a circumstance that can indicate a suspect did

---

[6] Young confines his argument to the issue of whether he knowingly and intelligently waived his Fifth Amendment rights under *Miranda* and never argues that he actually invoked his Fifth Amendment right to counsel, which would have required him to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Dozier v. State*, 306 Ga. 29, 35 (829 SE2d 131) (2019) (citation and punctuation omitted).

not knowingly and intelligently waive his rights." Id. at 893-894. "Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts." *Ellis v. State*, 299 Ga. 645, 647 (791 SE2d 16) (2016) (citation and punctuation omitted).

Here, Young argues that Detective Kenck's statement that "you get appointed with a lawyer when you're charged with something" contradicted *Miranda*'s warning about the right to counsel such that Young's waiver of his rights under *Miranda* was not knowingly and intelligently made. But Detective Kenck's statement was accurate insofar as an accused may be appointed a lawyer once he is charged with a crime under case law interpreting the Sixth Amendment. See *Davis v. United States*, 512 U.S. 452, 456 (114 SCt 2350, 129 LE2d 362) (1994) (explaining that the "Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings"); see also *Shaw v. State*, 307 Ga. 233, 246 (835 SE2d 279) (2019).

Additionally, because the record shows that Detective Kenck

properly advised Young of his *Miranda* rights and later told Young that "if [he] wanted a lawyer, and . . . wanted to go get one and come back and talk to us, that's—that's up to you," we cannot say that Detective Kenck misled Young about his Fifth Amendment right to an attorney under *Miranda* such that Young's waiver of his rights under *Miranda* was not knowing and intelligent.[7] Moreover, Young did not unambiguously invoke his right to counsel, and after Detective Kenck asked if Young wanted to talk without a lawyer present, Young replied, "Just talk, let's see what you got to say." Because Detective Kenck advised Young of his rights under *Miranda*; because Detective Kenck's statements did not contradict *Miranda*; and given that the record supports the trial court's conclusion that under the totality of the circumstances, Young made his interview statements knowingly and intelligently, we cannot say

---

[7] Contrary to Young's assertion that he had "the absolute right to a free lawyer prior to and during questioning," our case law establishes only that, under *Miranda*, a "suspect who asks for a lawyer at any time during custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation." *Dozier*, 306 Ga. at 35 (citation and punctuation omitted).

that the trial court's decision was erroneous, let alone clearly erroneous.[8] See *Williamson*, 305 Ga. at 894 ("A trial court's decision as to whether a defendant made a knowing and intelligent waiver of his *Miranda* rights will not be disturbed on appeal unless clearly erroneous.").

(b) Young argues that his statement "I'm done talking to you. If y'all find this s*** so funny, I'm done talking" was an unequivocal invocation of his Fifth Amendment right to remain silent, and that

---

[8] That Young was not provided false or misleading information about his rights under *Miranda* distinguishes this case from others Young points to in which defendants were misled or provided an incomplete or inaccurate explanation of their *Miranda* warnings. Compare *Hart v. Attorney Gen. for the State of Fla.*, 323 F3d 884, 894-895 (11th Cir. 2003) (concluding that the defendant's "waiver was not voluntary, knowing, and intelligent as required by *Miranda*" where law enforcement "contradicted the *Miranda* warning that anything [the defendant] said could be used against him in court" by telling the defendant that "honesty wouldn't hurt him" and the defendant "did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it"); *Benton v. State*, 302 Ga. 570, 575 (807 SE2d 450) (2017) (concluding that the defendant did not "knowingly and intelligently waive[ ] his rights under *Miranda*" where the record showed that the defendant "did not understand the *Miranda* warnings as read to him initially" and "the interrogating officer's subsequent explanation of those warnings was incomplete"); *Gray v. State*, 347 Ga. App. 235, 238 (817 SE2d 723) (2018) (concluding that the defendant "did not knowingly and intelligently waive his rights under *Miranda*" where the detective's response to a question asked by the defendant "directly contradicted the *Miranda* warnings" by saying the defendant was not "really giving up any rights" and where "the detective then incompletely paraphrased the right to remain silent").

the interrogation should have ceased after his purported invocation. We disagree.

"An accused may end a custodial interrogation at any time by invoking his constitutional right to remain silent. To do so, a defendant must unambiguously and unequivocally express his desire to invoke that right before officers are required to stop their questioning." *Dozier v. State*, 306 Ga. 29, 33 (829 SE2d 131) (2019) (citation and punctuation omitted); see also *Berghuis v. Thompkins*, 560 U.S. 370, 381 (130 SCt 2250, 176 LE2d 1098) (2010). "That determination depends on whether a defendant articulates a 'desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.'" *Dozier*, 306 Ga. at 33-34 (citation and punctuation omitted).

Viewed in context, the record here supported the trial court's finding that Young's statement was not an "unequivocal and unambiguous" invocation of his right to remain silent. *Dozier*, 306 Ga. at 34. Although the first half of the statement — "I'm done

talking to you" — might appear unequivocal in isolation, it was immediately followed by the conditional statement — "[i]f y'all find this s\*\*\* so funny, I'm done talking" — rendering the whole statement equivocal. See *Barnes v. State*, 287 Ga. 423, 425 (696 SE2d 629) (2010) (concluding that a defendant failed to invoke his right to remain silent because his statement, "if you're not going to talk real talk, then we shouldn't talk," was "conditional and ambiguous," rather than "unequivocal and unambiguous"). Moreover, video of the interview reveals that, rather than manifesting a desire to end questioning, Young continued talking as soon as detectives assured him that they would listen to his account of events. Because Young's statement was not so clear as to lead a reasonable police officer to understand that Young was "unequivocal[ly] and unambiguous[ly] invo[king] . . . his right to remain silent," it "was insufficient to trigger the [detective's] duty to cease questioning." Id. at 425-426.

3. Young argues that the trial court erred in admitting a Facebook photo of Young with a gun into evidence.

During Young's first interview at police headquarters, Young indicated that he had no knowledge of any guns in Unit 9301, that he did not own any guns, and that he would know if there were guns in the apartment. Detective Kenck then told Young that he had photos of Young "with guns." When asked by Young, Detective Kenck confirmed that he retrieved the photos from Facebook. Approximately two minutes later, Detective Kenck informed Young that police had found a gun in Unit 9301. Young then stated that he had taken "pictures with a lot of people holding guns." During his second interview, Young told the detectives that his fingerprints might be on the gun recovered from Unit 9301, which was later determined to be the murder weapon, because he had taken a photo with it.

Prior to trial, the State requested that the trial court rule on the admissibility of a Facebook photo that Detective Kenck showed Young during his interview. The State conceded that it did not know whether the gun in the photo was the murder weapon or even a real gun, but argued that the photo was relevant because Young changed

his story about not knowing about the existence of guns in Unit 9301 after the detective showed that particular photo to Young. Young argued that the photo was irrelevant and objected to its admission into evidence. The trial court found that the photo was admissible, and specifically that it was relevant "because it was shown to [Young] during the questioning."

At trial, Detective Kulnis identified the Facebook photo and indicated that it had been shown to Young during his interviews. Detective Kulnis also testified that she did not know whether the gun in the photo was the murder weapon or even a real gun. Young's trial counsel renewed his objection to the admission of the photo, and the trial court admitted it into evidence over objection.

On appeal, Young argues that the photo was not relevant under OCGA § 24-4-401 ("Rule 401"); had "zero probative value" under OCGA § 24-4-403 ("Rule 403"); and "amount[ed] to character evidence" under OCGA § 24-4-404 (b) ("Rule 404 (b)") because the

photo made "him look like a 'gun-toting lawbreaker.'"[9]   The State

responds that under Rule 401, the photo at issue was relevant to

Young's credibility, "was not *devoid* of" probative value, and "the

[photo's] scant probative value was not *substantially* outweighed by

a danger of *unfair* prejudice" under Rule 403.   (Emphasis in

original.)

Pretermitting whether the trial court's admission of the

Facebook photo was error, we conclude that, under the

circumstances of this case, any error was harmless.[10]  "The test for

---

[9] Young argues in his supplemental brief that the photo is character evidence "categorically prohibited by [OCGA § 24-4-404 (a)]" that cannot constitute harmless error because where there is "*zero* probative value to a photograph, the balancing test required under Rule 403 requires a finding of harm." (Emphasis in original.)  However, the Evidence Code provides for harmless error review of evidentiary errors, and we have often concluded that evidentiary error resulting from improperly admitted evidence at trial can nevertheless be harmless and decline to depart from that precedent today.  See OCGA § 24-1-103 (a) (explaining that "[e]rror shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); *Hood v. State*, 299 Ga. 95, 101-105 (786 SE2d 648) (2016).

[10] Although we pretermit trial court error regarding the admission of the photo at issue, some of us have expressed concern about the probative value of such a photo where, as here, the State offered a photo of a defendant holding a gun when the State did not indict the defendant on a firearms charge, admitted that it did not know whether the gun was the murder weapon and thus related to the case, and admitted that it did not even know whether the gun in the photo is a real gun.

determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Taylor v. State*, 306 Ga. 277, 283 (830 SE2d 90) (2019) (citation and punctuation omitted). "When applying harmless error analysis, we review the evidence de novo and weigh it as a reasonable juror would, rather than reviewing it in a light most favorable to upholding the jury's verdicts of guilty." Id. Here, "[i]t is highly probable that the admission of [the Facebook photo] did not contribute to the verdict." *Anglin v. State*, 302 Ga. 333, 341 (806 SE2d 573) (2017). The State presented strong evidence of Young's guilt apart from the Facebook photo discussed above. In particular, it offered Young's own admissions about his knowledge of, and participation in, the plan to rob Varnadore. In addition, Young admitted that his fingerprints may be on the murder weapon because he took a photo with it; Porter testified that she heard Lofton discuss ordering pizza and that right after she heard a gunshot and went into the living room, she saw Lofton come into the apartment carrying pizza and Young sitting on the couch "like he

was out of breath"; Harris testified that after she announced that a SWAT team had arrived at the apartment complex, she saw Young with a pancake box where the murder weapon was later found; and Detective Kenck testified that Buckley told him that Young and Lofton woke him up while he was sleeping to tell him that they had "hit a lick on the pizza man." See id. (concluding that the admission of security camera footage was harmless where "[t]he State's case against [the defendant] was strong").

Especially in light of Young's own admissions, the value of the Facebook photo to the State's prosecution and Young's guilt was marginal. See, e.g., *Johnson v. State*, 301 Ga. 277, 279-280 (800 SE2d 545) (2017). Detective Kulnis's admission at trial that she did not know whether the gun depicted in the Facebook photo was the murder weapon or even a real gun also diminished the photo's prejudicial effect. Moreover, any harmful effect that the Facebook photo may have had was diminished because it was cumulative of other properly admitted evidence, which included evidence pertaining to other pictures of Young with guns. To that end, in the

video recording of Young's police interviews, the jury heard Detective Kenck state that he had photos of Young "with guns" from Young's Facebook page; Young admit that he took pictures of a "lot of people holding guns"; and Young admit that his fingerprints might be on the murder weapon because he took a picture with it shortly before the incident. See *Kirby v. State*, 304 Ga. 472, 478-479 (819 SE2d 468) (2018) (concluding that the trial court's evidentiary error "was harmless" because "the other evidence of [the defendant's] guilt was compelling"); *Wright v. State*, 291 Ga. 869, 872 (734 SE2d 876) (2012) (concluding that no harm resulted from the improper admission of inadmissible hearsay where the testimony was "merely cumulative of other properly admitted evidence at trial").

Thus, under the circumstances of this case, it is highly probable that the jury's verdict was not affected by the admission of the Facebook photo. See *Kirby*, 304 Ga. at 478-479.

4. Young argues that his trial counsel was constitutionally ineffective for failing to move to suppress the search warrant for

Unit 9301.  Specifically, Young contends that he had standing as an overnight guest of at least two months; that trial counsel was deficient for concluding that Young did not have standing under the Fourth Amendment to the United States Constitution to challenge the search warrant; and that if trial counsel *had* filed a motion to suppress, he would have been successful because the search warrant application lacked probable cause.  But because Young has failed to show that the motion to suppress would have been successful had trial counsel filed it, his claim of ineffective assistance fails.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant.  See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010).  To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms."  *Romer v. State*,

293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. This requires a defendant to overcome the "strong presumption" that trial counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted). To carry the burden of overcoming this presumption, a defendant "must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Davis v. State*, 299 Ga. 180, 183 (787 SE2d 221) (2016).

To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010). Moreover, "[w]hen trial counsel's failure to

file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." *Rickman v. State*, ___ Ga. ___, ___ (842 SE2d 289) (2020) (citation and punctuation omitted).

Here, after some investigation, Detective Kenck applied for a search warrant of Unit 9301 and wrote the affidavit accompanying the search warrant application, which sought recovery of Papa John's pizza boxes, a .40-caliber gun, identification documents belonging to Varnadore, and the phone associated with the number that had called Papa John's for the order Varnadore delivered, among other items. A Gwinnett County magistrate judge issued the warrant on March 2, 2016. On appeal, Young argues that he had standing to challenge the search warrant and that the affidavit supporting the search warrant was "fatally defective" because the warrant application lacked a sufficient factual basis to constitute probable cause. At the motion for new trial hearing, Young's trial counsel testified that it was his "belief that [Young] did not have

standing to pursue" a motion to suppress "because [Young] was not a resident of the apartment."

In its order denying Young's motion for new trial, the trial court found that "even if trial counsel were wrong that [Young] lacked standing, [Young] has not made a strong showing that a motion to suppress would have been successful" because his "arguments about the validity of [the] search warrant lack merit" and that "[f]ailure to pursue a futile motion is not ineffective assistance of counsel." The trial court concluded that the information in the application "was sufficient to uphold the search warrant in this case," and that the "affidavit's recitation of facts . . . [was] sufficient to establish a substantial basis for finding that the items sought would be located in [Unit 9301]."

Pretermitting the question of whether Young's trial counsel was deficient for concluding that Young did not have standing to challenge the search warrant, Young has failed to meet his burden because he has not made a "strong showing" that the evidence would have been excluded had a motion to suppress been filed. See

*Rickman*, ___ Ga. at ___.

In determining whether probable cause exists to issue a search warrant, the magistrate's task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Prince v. State*, 295 Ga. 788, 792 (764 SE2d 362) (2014) (citation and punctuation omitted). "[T]he test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life." *Smith v. State*, 296 Ga. 731, 734 (770 SE2d 610) (2015) (citation and punctuation omitted). "The duty of an appellate court reviewing a search warrant is to determine, based on the totality of the circumstances, whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Leili v. State*, 307 Ga. 339, 342 (834 SE2d 847) (2019) (citation and punctuation omitted). "A magistrate's decision

to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court" and "[e]ven doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." *Prince*, 295 Ga. at 792 (citation and punctuation omitted). "The probable cause test requires only a fair probability — less than a certainty but more than a mere suspicion or possibility — which by no means is to be equated with proof by even so much as a preponderance of the evidence." *Jackson v. State*, 306 Ga. 706, 714 (832 SE2d 809) (2019) (citation and punctuation omitted).

Young contends that the "warrant application contain[ed] the bare conclusion that . . . Buckley lived in [Unit] 9301, which is insufficient." But that is not so. The application specified that the phone number associated with the TracFone that placed the Papa John's order that Varnadore delivered called Young's number — which detectives identified through Facebook — around the time of the murder; that "Detective Kulnis found a call from the Gwinnett County Jail" from Buckley to Young's phone number on February 2,

2016; and that "[f]urther research into Buckley revealed that he lived at" Unit 9301 of the Wesley Herrington Apartment Complex. The application also included a then-recent Gwinnett County Police Department case number associated with Buckley and then explained that "[r]esearch into [Unit] 9301 revealed another resident" — Lofton — and that both Buckley's and Lofton's Facebook pages were then located, which led to the discovery of a Facebook photo purportedly of Buckley, Lofton, and Young "inside of the Wesley Herrington apartments."

Young also argues that the application was deficient because "there were no facts in the affidavit showing that the items sought would be in [Unit] 9301." But the application specified (among other things) that the phone towers used to make the call to place the Papa John's pizza order "encompass[ed]" the Wesley Herrington Apartment Complex and linked Young's phone number to the TracFone that placed the Papa John's order and to Buckley and Lofton, who both lived in Unit 9301. The application also stated that a .40-caliber shell casing was recovered from the crime scene and

that several days prior to the shooting, a photo with a .40-caliber gun was uploaded to Buckley's Facebook account.

Based on the totality of the circumstances set forth in the search warrant application, the magistrate was authorized to conclude that the facts stated in the warrant application were sufficient to link the TracFone to the shooting, link Young to the TracFone, and ultimately link Young, Buckley, and Lofton to Unit 9301, and "the magistrate had a substantial basis for concluding that probable cause" therefore existed to issue the search warrant for Unit 9301. *Glispie v. State*, 300 Ga. 128, 133 (793 SE2d 381) (2016). Accordingly, because Young has not made a "strong showing" that the search warrant for Unit 9301 lacked probable cause and therefore would have been suppressed if counsel had made the motion, Young's ineffective assistance of counsel claim fails. See *Rickman*, ___ Ga. at ___. See also *Prince*, 295 Ga. at 792.

5. We have also considered the cumulative effect of the pretermitted errors in Divisions 3 and 4 and conclude that "the cumulative prejudicial effect of any such errors does not require a

new trial." *Smith v. State*, ___ Ga. ___, ___ (___ SE2d ___) (2020).

See also *Lofton*, ___ Ga. at ___ (citing *State v. Lane*, 308 Ga. 10, 13-18 (838 SE2d 808) (2020)).

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.
Murder. Gwinnett Superior Court. Before Judge Rich.
*Clark & Towne, David E. Clark*, for appellant.
*Daniel J. Porter, District Attorney, Samuel R. d'Entremont, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.