In the Supreme Court of Georgia

Decided: January 11, 2021

S20A1118. PALMER v. THE STATE.

BOGGS, Justice.

After a 2017 jury trial, Kevin Palmer was acquitted of malice murder but found guilty of felony murder and other offenses in connection with the shooting death of William Whitsett. His amended motion for new trial was denied, and he appeals, asserting as error the denial of his motion to suppress, the exclusion of alleged alibi testimony, and the ineffective assistance of his trial counsel. Concluding that there is no reversible error, we affirm.[1]

---

[1] The shooting occurred sometime between December 18, 2014, when Whitsett was last seen alive, and December 23, 2014, when his body was discovered. On February 4, 2015, a Chatham County grand jury indicted Palmer, Bradley Bates, and Genevieve Elizabeth Meeks for malice murder and other charges. Palmer's case was severed for trial, and he was indicted alone on January 25, 2017, for malice murder, felony murder, aggravated assault, possession of a firearm during commission of a felony, concealing the death of another, possession of marijuana with intent to distribute, possession of more than one ounce of marijuana, and possession of a controlled substance. Palmer

1. Construed in the light most favorable to the jury's verdicts, the evidence showed that in December 2014, Palmer lived at an apartment complex in Savannah with his girlfriend, Genevieve Meeks. He worked in her family's seafood restaurant, but he also sold marijuana and acted as a middleman for shipments of the drug to local dealers. On or about December 13, 2014, Whitsett, a friend of Palmer's from North Carolina, arrived in town and stayed at Palmer's apartment. Palmer initially told Meeks that Whitsett was just stopping by on his way to Florida, but he later told her that Whitsett would be staying for a while and was ordering marijuana

was tried before a jury from February 6 to 10, 2017 and found not guilty of malice murder but guilty of all remaining charges. On February 21, 2017, Palmer was sentenced to serve life in prison with the possibility of parole for felony murder, plus five years to serve consecutively for firearms possession, ten years to serve consecutively for concealing the death of another, ten years to serve consecutively for possession of marijuana with intent to distribute, and ten years to serve concurrently for possession of a controlled substance, for a total of life in prison plus 25 years. The trial court merged the aggravated assault count into the felony murder count and the count charging possession of more than one ounce of marijuana into the possession with intent to distribute count. On March 6, 2017, Palmer's trial counsel filed a motion for new trial, which was amended by appellate counsel on January 26, 2018 and August 12, 2019. After a hearing on August 29, 2019, the motion was denied on January 30, 2020. Palmer's notice of appeal was filed on February 6, 2020, and the case was docketed in this Court for the August 2020 term and submitted for decision on the briefs.

to be delivered to the apartment for Palmer to sell. Whitsett purchased a Smart TV and a PlayStation and set them up in the apartment.

On the morning of Thursday, December 18, Meeks saw Whitsett for the last time. Palmer dropped Meeks off at the restaurant and left in her car. He brought the car back to the restaurant around 6:30 that evening, then left to play soccer with friends at the "Y." After leaving work at 8:00 p.m., Meeks picked Palmer up after the soccer game and they drove home, but Whitsett was not there. When Whitsett had still not appeared by Friday morning, Meeks expressed concern. Palmer took their dogs outside and returned to tell Meeks that he had found notes from Whitsett saying that he had left for Florida and that Palmer could keep all his belongings, including his car. When Meeks asked how they could use the car without the keys, Palmer within "a second or two" located the keys in a wheel well of the car. Palmer also took a shotgun out of the car and brought it into the apartment.

Later that day, Palmer told Meeks he had a phone call from

3

Whitsett, but refused to let her speak with him. He also took a "long break" from work, during which he did not answer his phone. He later told Meeks that he did not answer the phone because he took their dogs on a long walk, they got muddy, and he had to bathe them. On Friday and Saturday, packaged marijuana arrived at the apartment, and Palmer immediately began selling it, telling Meeks that Whitsett had agreed to let him keep some of the marijuana in return for letting Whitsett stay at their apartment and for receiving the marijuana at their address.

On Tuesday, December 23, a telephone lineman discovered Whitsett's body in an overgrown wooded area at the foot of a railway embankment and below an elevated highway bridge, but accessible by a trail leading from behind Palmer's apartment building to the railroad tracks, a distance of approximately a hundred yards. Whitsett was lying in a ditch and partially concealed by a stone wall, part of a tire, and other debris. A shirt and sweatshirt were pulled up over his head, and he was shoeless but wearing socks. The police initially believed that Whitsett might have been hit by a train, and

the case was referred to the medical examiner as a victim of "suspected trauma." Upon receiving the body, however, the medical examiner immediately saw that Whitsett had multiple gunshot wounds. An autopsy, performed the following Friday on account of the Christmas holiday, revealed that Whitsett had four gunshot wounds to his face and head and a defensive gunshot wound to his arm, all from .22 caliber bullets, four of which were recovered from the body. Marks on Whitsett's chin, neck, and torso indicated that his body had been dragged along the ground by his feet. Due to lack of knowledge of the environmental conditions at the scene, the medical examiner was unable to establish a time of death.

Police officers canvassed the nearby area for possible witnesses, without success. The next day, after identifying Whitsett from his fingerprints, they located his car parked next to the building in which Palmer's apartment was located, and learned from Palmer's neighbor, Bradley Bates, that Whitsett had been staying with Palmer and Meeks. Palmer was interviewed by the police on Wednesday, December 24, and told them that Whitsett came to town

on December 22 and that he had brought all the marijuana in the apartment with him. Palmer said that the shotgun was his and that he had purchased it when he worked in a particular pawn shop in Alma, Georgia.[2] He also told the police about the handwritten notes in which Whitsett said Palmer could have all Whitsett's personal items, but a forensic document examiner testified at trial that the notes were actually written by Palmer.

Palmer told the police investigators multiple conflicting stories regarding Whitsett's death: that the murder was probably gang related, that Whitsett was a bad person and a racist, that he "was always getting into trouble" because "he didn't care what he said," and that he had left "to go do some type of deal or something." While alone but observed in the interview room, Palmer called his mother and told her that he was the last person to see the victim alive. He also called Meeks and told her that the only thing he was worried about was his .22-caliber pistol, even though the police had not yet

---

[2] The pawn shop owner testified at trial that, while Palmer was a school friend of the owner's son, Palmer had never worked for him and he never sold Palmer a shotgun.

made public the fact that Whitsett was shot with a .22-caliber firearm. After speaking with Meeks, Palmer also changed his story about Whitsett's disappearance, telling the police that he "walked" Whitsett to a local grocery store to purchase cocaine from some unknown individuals. Palmer also told the police that he had a .22 pistol in a kitchen cabinet.

Later the same day, December 24, the police executed a search warrant for Palmer's apartment and Meeks' vehicle. They found a .22-caliber pistol, the box for the pistol, and a jar of marijuana in a cabinet in Palmer's kitchen. A forensics expert testified that three of the four bullets recovered from Whitsett's body were fired from that pistol; the fourth was too damaged for a comparison to be made. Whitsett's shotgun, PlayStation, and television, as well as his Louis Vuitton suitcase containing marijuana, were found in Palmer's apartment, along with marijuana oil and $900 in cash. A search of Meeks' Camaro revealed a small handgun belonging to Whitsett in a bag in the car's trunk, as well as a note reading "It's all Kevin's."

After Palmer's arrest, he was in the jail's common area when a

television news story came on about Whitsett's murder. He told another inmate that he and his girlfriend were going to "beat the case" because "they didn't have no evidence on him," that the murder was a result of robbing a man for "a large amount of marijuana," and that they were going to sell the marijuana out of the seafood restaurant where his girlfriend worked.

Palmer has not challenged the sufficiency of the evidence to support his convictions. However, under this Court's practice in murder cases, we have reviewed the record to determine the legal sufficiency of the evidence supporting his convictions.[3] We conclude that the evidence presented at trial and summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Palmer was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

---

[3] We remind litigants that the Court will end our practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

2. In Palmer's first enumeration of error, he contends that the trial court erred in denying his motion to suppress the evidence seized as a result of the search warrant obtained for his apartment, asserting that the warrant was issued without probable cause, contained an intentionally or recklessly false statement in violation of *Franks v. Delaware,* 438 U. S. 154 (98 SCt 2674, 57 LE2d 667) (1978), and was also an impermissible general warrant. We disagree.

(a) Palmer contends that the search warrant was issued without probable cause under *Illinois v. Gates,* 462 U. S. 213, 239 (III) (103 SCt 2317, 76 LE2d 527) (1983). In reviewing whether probable cause existed to support issuance of a search warrant, we bear in mind that

> the magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of

9

everyday life.

(Citations and punctuation omitted). *Young v. State*, 309 Ga. 529,

540 (4) (847 SE2d 347) (2020).

> The trial court may then examine the issue as a first level
> of review, guided by the Fourth Amendment's strong
> preference for searches conducted pursuant to a warrant,
> and the principle that substantial deference must be
> accorded a magistrate's decision to issue a search warrant
> based on a finding of probable cause.

(Citation and punctuation omitted.) *State v. Palmer*, 285 Ga. 75, 77

(673 SE2d 237) (2009). And when an appellate court reviews a

search warrant, it uses the *Gates* totality-of-the-circumstances

analysis

> to determine if the magistrate had a substantial basis for
> concluding that probable cause existed to issue the search
> warrant. The Fourth Amendment requires no more. In
> reviewing the trial court's grant or denial of a motion to
> suppress, we apply the well-established principles that
> the trial court's findings as to disputed facts will be
> upheld unless clearly erroneous and the trial court's
> application of the law to undisputed facts is subject to de
> novo review, keeping in mind that a magistrate's decision
> to issue a search warrant based on a finding of probable
> cause is entitled to substantial deference by a reviewing
> court.

(Citations and punctuation omitted.) Id. at 78. See also *Leili v. State*,

307 Ga. 339, 341-342 (2) (834 SE2d 847) (2019).

The affidavit in support of the application for the search warrant recited that, after discovering Whitsett's body at the bottom of a railroad track and just off a small trail leading to Palmer's apartment complex, the police located Whitsett's vehicle in the parking lot next to Palmer's apartment. A police officer asked Bradley Bates, who was nearby, if he knew anything about the car. Bates told them that it belonged to Whitsett, and that Bates

> had been hanging out with the victim in his apartment E-33. He stated he had not seen him in almost a week. He advised that he knew the victim was staying with another friend living across the hall in apartment number E-34. He said the victim was living in apartment E-34 with Kevin Palmer. Kevin Palmer was also found to be from North Carolina. Kevin and the victim were friends.

The affidavit further stated that when Bates was asked if he could call Palmer and ask him to come and speak with the officers, "[w]hile standing in front of detectives Brad [Bates] called Kevin [Palmer] via cell phone. He said to the person he called '[that he] needed to come home, detectives wanted to talk to him about the body they found.' At that point no one had said anything about a body." In

11

addition, while the police waited for Palmer to arrive, the medical examiner called to inform the police that Whitsett had been shot three times in the head with a .22-caliber handgun. When Palmer arrived and was asked to come down to talk to the detectives "about his friend William," he began crying.

Palmer argues, in effect, that the evidence presented to the magistrate should have been construed differently. He contends, for example, that Bates' statement that Whitsett was "staying" or "living" with Palmer and Meeks actually meant Whitsett was "merely an overnight guest," and that the spontaneous statement to Palmer by Bates, about "the body they found" and Palmer's lack of surprise at that information could be explained by having heard neighborhood gossip. Such arguments, however, ignore our deferential standard of review and the requirement that we consider the totality of the circumstances in determining whether the magistrate, as a practical, common-sense matter, had a substantial basis for concluding that probable cause existed to issue the search warrant. See *Palmer*, 285 Ga. at 77-78; see also *Leili*, 307 Ga. at 343-

344 (2) (a). The trial court therefore did not err in denying Palmer's motion to suppress on this ground.

(b) Palmer also points to a written "detective supplemental" report prepared by Detective Patrick Johnson and dated March 27, 2015, which contradicts the search warrant affidavit made by Detective Chris Ross with regard to whether Bates learned about the discovery of the body from the police before he made the phone call to Palmer.[4] For this reason, Palmer contends the affidavit violated *Franks*, in which the United States Supreme Court held that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining

---

[4] The supplemental report states: "I then asked Mr. Bates if he heard the news about the dead body discovered near the apartment complex; Mr. Bates stated yes. This investigator then asked Mr. Bates to contact his neighbor and to have him report back to our location so that I could speak with him."

13

content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U. S. at 155-156. See also *Carter v. State*, 283 Ga. 76, 77 (2) (656 SE2d 524) (2008). Palmer contends that Detective Ross' statement in the affidavit was knowingly false or made with reckless disregard for the truth.

At the hearing on Palmer's motion to suppress, Detective Ross testified that after Bates made the statement about "the body they found" in the call to Palmer, Detective Ross asked each police officer present if he or she had told Bates about the discovery of the body, and all the officers told Detective Ross that they had not mentioned it, including Detective Johnson, who later prepared the supplemental report.[5] The existence of a discrepancy in a lengthy report prepared some three months after the events in question, unsupported by testimony from the author of the report, and directly contradicted by the affiant's testimony at the hearing, would not

---

[5] Detective Johnson did not testify at the hearing on the motion to suppress.

14

appear to demonstrate by a preponderance of the evidence that the affidavit was knowingly false or made in reckless disregard of the truth. See *Stanford v. State*, 272 Ga. 267, 271 (10) (528 SE2d 246) (2000) (affidavits stated two different locations for victim's death; affiant acknowledged "mistake" but denied deliberately lying; this Court noted that "[t]his slight discrepancy . . . does not suggest an intentional or reckless falsehood on the part of the affiant." (Footnote omitted.)).

But even assuming, without deciding, that the existence of an intentional or reckless falsehood could be established under *Franks*, the trial court correctly concluded that "the affidavit's remaining content" was sufficient to establish probable cause independently of any knowledge on Bates' part that a body had been discovered. Palmer and Whitsett were friends and knew each other from North Carolina, both were living in the apartment for which the warrant was sought, Whitsett's car was parked next to Palmer's apartment building, and Whitsett's body was found beside a trail originating at the apartment complex. When Palmer was asked "to talk to us about

15

his friend William," he began crying, from which an inference could be drawn that Palmer already knew that Whitsett was dead. Based on the totality of the circumstances absent the complained-of statement, the magistrate still could make a common-sense determination that Palmer had some knowledge of or connection with Whitsett's death, and that a fair probability existed that items such as those enumerated on the search warrant would be found in the apartment he shared with Whitsett. The trial court therefore did not err in denying Palmer's motion to suppress on this ground.

(c) Palmer also contends that the search warrant contained "a general description with no particularity," in violation of the Fourth Amendment and OCGA § 17-5-21. The warrant authorized the search and seizure of:

> any fingerprints, any and all firearms, any and all ammunition, shell casings, identification cards, receipts, photos, hand written statements, cell phones (to include all data contained therein), currency, and any and all blood evidence, and DNA, which are being possessed in Violation of Georgia Law(s): O.C.G.A. [§] 16-5-1 Murder.

In its order denying Palmer's motion to suppress, the trial court

concluded that the description of the types of evidence sought in the warrant was sufficient, because the warrant enumerated each class of item seized from the apartment and the classes enumerated were potentially relevant to the crime being investigated. We agree.

> As this Court recently explained, the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit.

(Citations and punctuation omitted.) *Rickman v. State*, 309 Ga. 38, 42 (2) (842 SE2d 289) (2020); see also *Leili*, 307 Ga. at 344 (2) (a). "Read in a common-sense fashion and in the context of the preceding list of items and the residual clause," warrants limiting items to be seized to those relevant to enumerated crimes "have sufficient specificity, satisfying the particularity requirement of the Fourth Amendment." (Citations and punctuation omitted.) *Reaves v. State*, 284 Ga. 181, 188 (2) (d) (664 SE2d 211) (2008). Here, the search warrant listed classes of items that, as a practical matter, were likely to be found relevant to the shooting death of Whitsett and the

removal of his body to the location where it was found. Finally, the warrant limited the classes of items to those relevant to the crime of murder. The trial court therefore did not err in denying Palmer's motion to suppress on this ground.[6]

3. Palmer also contends that the trial court erred in excluding possible alibi evidence from a person named Kyle Lynsky. As Palmer's trial began, the State moved to preclude Palmer from introducing alibi evidence because he had not filed a "written notice of the defendant's intention to offer a defense of alibi" as required by OCGA § 17-16-5 (a).[7] During the colloquy that followed, Palmer's

---

[6] While the State also contends that Palmer gave police officers consent to search his apartment, the trial court did not reach that issue, nor is it necessary for this Court to consider it.

[7] That Code section provides:
Upon written demand by the prosecuting attorney within ten days after arraignment, or at such time as the court permits, stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days of the demand of the prosecuting attorney or ten days prior to trial, whichever is later, or as otherwise ordered by the court, upon the prosecuting attorney a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names, addresses, dates of birth, and telephone numbers of the witnesses, if known to the defendant, upon whom the defendant intends to rely to establish such alibi unless previously supplied.

counsel stated that he had not filed such a notice because there was no evidence showing when Whitsett was killed. Asked by the trial court, "Are you going to call any witnesses?" counsel responded, "Not on an alibi issue. No, ma'am." He added that he intended to call Kyle Lynsky and that "[h]e was interviewed by the police after the police interviewed my client. My client said Kyle came by to pick [him] up at the apartment and drove [him] to the soccer game. Saw Will [Whitsett] coming down the stairs with [him] when [they] walked over to the China restaurant." The trial court observed, "It sounds like it's in the nature of alibi to me. So don't call that witness, not for that purpose anyway."

Near the beginning of the third day of the trial, the trial court reiterated that Palmer could call Lynsky for any other purpose, but at that point counsel revealed that the witness was not under subpoena and, in fact, was in Portland, Oregon.[8] When Palmer's counsel attempted to question a police detective regarding Lynsky's

---

[8] Under questioning from the trial court, counsel claimed that he did not subpoena Lynsky "because of the Court's ruling." That ruling, however, was made during the first day of trial.

statement, the trial court noted that Lynsky was not available as a witness and that there was a hearsay problem "without regard to a ruling on the alibi issue." Lynsky did not testify, but the transcript of his recorded interview was proffered into evidence "[f]or record purposes only."[9]

We need not consider the issues of the notice of alibi or the State's demand therefor, counsel's disclaimer of any intent to call an alibi witness, or the unavailability of Lynsky, because, even assuming that the trial court erred in excluding Lynsky's testimony, Palmer has failed to show harm as a result of any such error.

"[I]t is fundamental that harm as well as error must be shown for reversal." (Citations and punctuation omitted.) *O'Neal v. State*,

---

[9] In the transcript of the recorded interview, Lynsky told the police that he, Palmer, and "a big group" of soccer players were going to carpool to their regular Thursday game. When Lynsky arrived in the parking lot of Palmer's apartment with the other players, he saw Palmer "walking [Whitsett] out of the parking lot." Palmer said that Whitsett was "my friend from college" and that "[h]e's leaving," and Lynsky thought nothing more of it. He did not notice which way Palmer and Whitsett went; he was not even sure of the date on which the encounter took place. Palmer drove Meeks' car and left it at the seafood restaurant, where he met Lynsky and the other players and rode with them to the game. Lynsky also mentioned that, either that day or the Thursday following, Palmer told Lynsky that Whitsett had "gone off with somebody," and that Palmer was worried about him.

288 Ga. 219, 223 (2) (702 SE2d 288) (2010). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citations, punctuation, and footnote omitted.) *Smith v. State*, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." (Citations and punctuation omitted.) *Peoples v. State*, 295 Ga. 44, 55 (4) (c) (757 SE2d 646) (2014).

Viewed in this light, the trial court error, if any, was harmless. As Palmer's trial counsel repeatedly acknowledged, the date and time of Whitsett's death were unknown, and in Lynsky's recorded statement to the police, he was unsure of details such as where Palmer and Whitsett went, the time, or even the date on which he

encountered them. In addition, the evidence of Palmer's guilt was strong. See *Graves v. State*, 303 Ga. 305, 308 (2) (812 SE2d 290) (2018) (any error in excluding alibi testimony harmless in light of overwhelming evidence of guilt and lack of specificity in proffered testimony); see also *Keller v. State*, 308 Ga. 492, 503 (5) (842 SE2d 22) (2020) ("[I]n light of the strong evidence of [appellant's] guilt," refusal to allow appellant's expert witness testimony "harmless error, if error at all" because highly probable that exclusion of evidence did not contribute to verdict.) (Citations and punctuation omitted.).

Here, Whitsett was living with Palmer, and both were involved in selling drugs. Whitsett's body was found in a secluded area near the end of a path leading from Palmer's apartment complex, shoeless and with drag marks on his body, and with multiple head wounds inflicted by bullets fired from Palmer's pistol. The police found the pistol in a kitchen cabinet in Palmer's locked apartment, where Palmer said it would be. Palmer purportedly took a telephone call from Whitsett after he disappeared and wrote notes ostensibly from

Whitsett that left all of Whitsett's belongings to Palmer. Palmer then immediately began using Whitsett's property and selling the drugs ordered by Whitsett. He told conflicting stories to police investigators and made damaging admissions to his girlfriend. He also told a fellow jail inmate that he had planned the murder in order to obtain drugs, giving details that the inmate was unlikely to have known independently. Even assuming that the trial court erred, and further assuming that Lynsky's attendance could have been secured for trial, it is highly probable that any error in not allowing Lynsky's vague testimony did not contribute to the jury's guilty verdicts, and therefore was harmless.

4. In his final enumeration of error, Palmer asserts that his trial counsel was ineffective in failing to file a notice of alibi testimony. To prevail on his claim of ineffective assistance, Palmer must prove both that the performance of his lawyer was professionally deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance,

23

Palmer must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation omitted.) *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). And to prove prejudice, Palmer "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). If an appellant fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

Here, Palmer has failed to demonstrate prejudice, because at the hearing on Palmer's motion for new trial, he never presented Lynsky's testimony or a legally acceptable substitute, as required to demonstrate prejudice in the context of ineffective assistance of counsel. See *Roberts v. State*, 305 Ga. 257, 266-267 (5) (c) (824 SE2d 326) (2019). And "unsworn statements to police are not a legally

acceptable substitute for witness testimony needed to prove prejudice." (Citation omitted.) *Harris v. State*, 304 Ga. 652, 656 (2) (b) (821 SE2d 346) (2018). See also *Lupoe v. State*, 284 Ga. 576, 578-579 (3) (b) (669 SE2d 133) (2008) (appellant failed to demonstrate ineffective assistance when alleged alibi witness did not testify at hearing on motion for new trial and appellant provided no legally acceptable substitute to show testimony would have been favorable). Moreover, as noted above, the evidence of Palmer's guilt was strong. Palmer therefore has failed to show ineffective assistance on the part of his trial counsel.

*Judgment affirmed. Melton, C.J., Nahmias, P.J., and Peterson, Warren, Bethel, Ellington, and McMillian, JJ., concur.*