314 Ga. 44
FINAL COPY

S22A0591.  COPELAND v. THE STATE.

WARREN, Justice.

Ladarrwin Davion Copeland was convicted of malice murder and other crimes in connection with the shooting deaths of Timothy Rodgers and Ricky Johnson.[1]  On appeal, Copeland contends that

---

[1] Rodgers and Johnson were killed on January 28, 2017.  On May 10, 2017, a Gwinnett County grand jury indicted Copeland for two counts each of malice murder, felony murder, and aggravated assault, and one count each of possession of a firearm during the commission of a felony and possession of a firearm by a convicted felon.  At a trial from September 9 to 13, 2019, a jury found Copeland guilty on all counts.  On September 20, 2019, the trial court imposed concurrent sentences of life in prison without the possibility of parole for the malice murder counts, a concurrent term of five years for possession of a firearm during the commission of a felony, and a consecutive term of five years for possession of a firearm by a convicted felon.  The remaining counts were merged or vacated by operation of law.  Copeland timely filed a motion for new trial on October 1, 2019, which he amended through new counsel on September 7, 2021.  The trial court denied the amended motion on November 12, 2021.  Copeland timely filed a notice of appeal on December 7, 2021.  The trial court amended the sentence on December 13, 2021, nunc pro tunc to September 13, 2019.  The only change from the September 20, 2019 sentence was to make the five-year term for possession of a firearm during the commission of a felony consecutive rather than concurrent.  See OCGA § 16-11-106 (b) (requiring the five-year sentence for that crime "to run consecutively to any other sentence which the person has received"); *Parrott v. State*, 312 Ga. 580, 582 (864 SE2d 80) (2021) ("A trial judge has the authority to correct a void

the trial court lacked jurisdiction to try his case, that the evidence was insufficient to sustain his convictions, and that the trial court erred in denying his motion to suppress evidence related to the search of his cell phone records. Seeing no error, we affirm.

1. Copeland first contends that the trial court lacked jurisdiction to try his case because he had filed a pro se notice of appeal before his trial, and the remittitur from this Court was not filed in the trial court until after the conclusion of the trial. We disagree.

A criminal defendant's "pretrial notice of appeal, if effective, . . . deprive[s] the trial court of jurisdiction to try [him] until his appeal [i]s resolved and the trial court receive[s] and file[s] the remittitur from the appellate court." *Tolbert v. Toole*, 296 Ga. 357, 360 (767 SE2d 24) (2014). However, "[a] criminal defendant in

---

sentence at any time, and a sentence is void if the court imposes punishment that the law does not allow.") (citations and punctuation omitted); *Hartman v. State*, 266 Ga. 613, 615 (469 SE2d 163) (1996) (approving trial court's amendment of void concurrent sentence that was contrary to OCGA § 16-11-106 (b), so that it would conform to the law and run consecutively instead). The case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

Georgia does not have the right to represent himself and also be represented by an attorney, and pro se filings by represented parties are therefore unauthorized and without effect." Id. at 363 (citation and punctuation omitted).

That is what happened here when Copeland filed a pro se notice of appeal when he was still represented by counsel. Indeed, this Court dismissed Copeland's pro se pre-trial appeal on the ground that, "because he was represented by legal counsel at the time his notice of appeal was filed, his notice of appeal [was] a legal nullity." Copeland's pro se notice of appeal therefore had no legal effect and did not divest the trial court of jurisdiction to try his case. See *Tolbert*, 296 Ga. at 363 ("Tolbert's pro se notice of appeal, filed when the record indicates that he was represented by counsel, had no legal effect and thus did not divest the trial court of jurisdiction to try him.").[2]

---

[2] Copeland argues that *Tolbert* is distinguishable because the record in that case was never prepared and transmitted to the appellate court. But the effectiveness of a notice of appeal does not depend on whether it has been docketed in this Court or whether the record has been transmitted to this Court.

3

2.    Having resolved the threshold jurisdictional question Copeland raised, we now turn to his enumerations of error about the merits of his case and first examine the sufficiency of the evidence. Viewed in the light most favorable to the verdicts, the evidence presented at Copeland's trial showed the following.  In the early morning hours of January 28, 2017, both Rodgers and Johnson were killed with a .32-caliber handgun at a motel in Gwinnett County. The only eyewitness, Nikita Riley, was Copeland's girlfriend and Rodgers's ex-girlfriend.  She testified as follows:  Although Riley and Rodgers were no longer in a romantic relationship, Riley would receive mail for Rodgers and stayed in contact with him.  Rodgers was often verbally abusive toward Riley, and when Copeland would answer Rodgers's calls to Riley, Copeland and Rodgers would argue.

On the night of the shootings, Rodgers repeatedly called Riley because she had received his medication in the mail and he wanted her to bring it to him.  At one point, Copeland answered Riley's phone and argued with Rodgers.  After the phone call, Copeland told Riley: "Don't ever let nobody get comfortable disrespecting you."

Later, Copeland drove Riley in his blue van to the motel where Rodgers was staying.

After arriving at the motel, Riley knocked on Rodgers's door, not realizing that Copeland had followed her to the door. Johnson, who was an employee of Rodgers, opened the door. Copeland shot Johnson once and then pushed Riley into the motel room. Johnson stumbled out to the parking lot, where he fell face down and died from the gunshot wound. Once inside the motel room, Copeland shot Rodgers four times, killing him.

From about 1:45 to 2:00 a.m. on January 28, 2017, the motel resident in the room above Rodgers heard a man and a woman arguing outside of the motel, and then heard a "thud" followed by a woman's scream. Around the same time, some people in a car driving through the parking lot of the motel saw Johnson's body lying in the parking lot. After dropping someone off and approaching the body, they were cut off by a blue vehicle with unusual headlights that was exiting the parking lot.

According to Riley, she did not know that Copeland was going

5

to shoot the victims. As she and Copeland fled the scene in Copeland's blue van, Riley asked Copeland if he was going to kill her, and he said he was not. Riley was scared but did not call the police because she was under the influence of drugs at the time and both she and Copeland had been drinking. The two drove to Riley's cousin's home. Riley began crying and became very upset and told her cousin that Copeland and Rodgers "got into a fight."

The cell phones of both victims were recovered at the scene of the crimes. Investigators later extracted data from the cell phones of Riley, Rodgers, Johnson, and Copeland, and obtained related phone records and cell-site location data from cellular providers. That information demonstrated that Riley's and Copeland's phones were in the same area before the crimes occurred, were in the area of the crimes around the time they occurred, and were also near one another afterward; that the last phone call to Rodgers's phone was from Riley's phone; and that prior to the murders, Riley and Rodgers were exchanging messages about Riley bringing Rodgers his medicine and mail.

Copeland was taken into custody, told police that he drove a blue van, and admitted that he knew who Rodgers was. However, Copeland denied any involvement in or knowledge of the murders.

Copeland's argument regarding evidentiary sufficiency is confusing because he appears to conflate the test for constitutional sufficiency of the evidence with the statutory requirement that accomplice testimony must be corroborated to sustain a conviction. Specifically, Copeland asserts that "the evidence adduced at trial was insufficient to enable a rational trier of fact to find Appellant guilty beyond a reasonable doubt" of the murders and related offenses. But the primary thrust of his argument appears to be that the testimony of Riley, as an alleged co-conspirator or party to the crimes, lacked the "necessary corroboration."

When evaluating a challenge to the sufficiency of the evidence as a matter of federal constitutional due process under *Jackson v. Virginia,* 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979), we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have

found the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Butler v. State*, 313 Ga. 675, 679 (872 SE2d 722) (2022). In so doing, "[w]e leave to the trier of fact the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." Id. (citations and punctuation omitted). "When we consider the legal sufficiency of the evidence under *Jackson v. Virginia*, we consider all the evidence presented at trial, without regard to whether some of that evidence might have been improperly admitted." *Collins v. State*, 312 Ga. 727, 733-734 (864 SE2d 85) (2021) (citation and punctuation omitted).

Under Georgia statutory law, "[t]he testimony of an accomplice must be corroborated to sustain a felony conviction." *Yarn v. State*, 305 Ga. 421, 423 (826 SE2d 1) (2019) (citing OCGA § 24-14-8). Just as with our evaluation of the sufficiency of the evidence as a matter of constitutional due process, "in considering sufficiency of the corroboration of an accomplice's testimony, we must consider all the

8

evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *State v. Thomas*, 311 Ga. 407, 420 (858 SE2d 52) (2021) (citation and punctuation omitted).

"[A]lthough Georgia law requires independent corroboration of an accomplice's testimony to secure a conviction, federal law does not require such corroboration and, thus, a failure to corroborate accomplice testimony does not offend constitutional due process." *Goodman v. State*, 313 Ga. 762, 767 (___SE2d ___) (2022) (citation and punctuation omitted). Moreover, if the evidence "would have authorized a properly instructed jury to find that a witness was *not* an accomplice, that finding would eliminate the need for corroboration under OCGA § 24-14-8, and the witness' testimony alone could be sufficient to convict." *Johnson v. State*, 311 Ga. 221, 223 (857 SE2d 463) (2021) (emphasis in original). In deciding the issue of whether a witness is an accomplice, it is "for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." Id. at 224 (citation and punctuation omitted).

9

With respect to the sufficiency of the evidence, we reject Copeland's arguments. Although he argues that no physical evidence connected him to the murders other than the evidence of his cell phone data that is the subject of his remaining enumeration of error, we need not exclude that evidence from our sufficiency analysis even if he is correct that it was improperly admitted. See *Collins*, 312 Ga. at 733-734. Copeland also attacks Riley's credibility, arguing that she was a party to the crimes, was subjected to lengthy police questioning, and gave equivocal testimony as to whether the State had promised her anything in exchange for her testimony. But questions about Riley's credibility were for the jury to decide. See *Butler*, 313 Ga. at 679. We conclude that the evidence presented at trial and summarized above, when viewed in the light most favorable to the verdicts, was sufficient as a matter of constitutional due process to authorize a rational jury to find Copeland guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson*, 443 U.S. at 319.

With respect to Georgia's statutory requirement that the

10

testimony of an accomplice be corroborated to sustain a felony conviction, even assuming (without deciding) that the evidence could have supported a finding that Riley was an accomplice, the evidence also authorized the jury to find that she was not an accomplice. Any issues about Riley's credibility that might have affected the finding of whether she was an accomplice were for the jury to decide. See *Johnson*, 311 Ga. at 224. The jury—having been given the pattern jury instructions on accomplice corroboration, including the charge that "[w]hether or not any witness in this case was an accomplice is a question for you to determine from the evidence in this case"—was authorized to credit Riley's own testimony that she did not know Copeland would shoot the victims and that she was afraid he might shoot her, too. That testimony was sufficient to authorize the jury to find that Riley was not an accomplice and that her testimony did not need to be corroborated under OCGA § 24-14-8. See *Fisher v. State*, 309 Ga. 814, 819 (848 SE2d 434) (2020) ("The properly charged jury was authorized to credit [the] testimony [of the only witness to identify Appellant as

11

the shooter] that [the witness] had no prior knowledge that Appellant would shoot or kill [the victim] and that [the witness] drove Appellant away from the shooting out of fear that Appellant might shoot him too. The jury could thus determine that [the witness] was *not* an accomplice and that his testimony did not need to be corroborated.") (emphasis in original). Copeland's enumeration therefore fails.

3. Copeland contends that the trial court erred in denying his motion to suppress evidence obtained from a search of his cell phone records, including "cell-site location information" and "geolocation information." The affidavit supporting the application for the warrant that authorized the search, Copeland argues, lacked a sufficient factual basis to constitute probable cause. We disagree.

In determining whether probable cause exists to issue a search warrant, the magistrate's task "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *Johnson v. State*, 310 Ga. 685, 694 (853 SE2d 635) (2021) (citation and punctuation omitted). "The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life." *Young v. State*, 309 Ga. 529, 540 (847 SE2d 347) (2020) (citation and punctuation omitted). "On appellate review, our duty is to determine if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search warrant." *Johnson*, 310 Ga. at 694 (citation and punctuation omitted). The decision of a magistrate "to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court[,] and even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." *Young*, 309 Ga. at 541 (citation and punctuation omitted). "The probable cause test requires only a fair probability—less than a certainty but more than a mere suspicion of possibility—which by no means is to be equated with proof by even so much as a preponderance of the evidence." Id. (citation and punctuation omitted).

In the affidavit at issue here, Detective Justin Hipps attested as follows: cell phones belonging to both victims were recovered at the scene of the shooting. Detective Hipps called the last outgoing number from Rodgers's phone and reached Riley, whom Rodgers's family identified as Rodgers's ex-girlfriend. After Riley agreed to an interview with Detective Hipps but failed to show up or answer her phone again, and after Detective Hipps received a tip that Riley's boyfriend committed the homicides, another detective analyzed Riley's phone records. That detective determined, through social media and a records check, that the most-called number (370 times in one month) belonged to Copeland, and that Riley had called Copeland before and after the shootings. An investigation of Copeland revealed that he was on probation and had an active warrant for his arrest. A location check of Riley's phone showed that it "pinged" during and after the homicides at the same location as the homicides, and it later became stationary in the same area as Copeland's address. When Detective Hipps would attempt to call Riley following the scheduled interview that she missed, the call

14

would go straight to voicemail, and he was unable to locate her "in the two known locations where she live[d]." Believing that Riley was "on the run" and had discontinued use of her cell phone, Detective Hipps requested Copeland's phone records because he believed that Riley, in the likely circumstance that she had obtained a new phone, would still be in contact with Copeland based on their frequent cellular communications and Detective Hipps would be able to identify Riley's new number from Copeland's phone records.

Copeland argues that the affidavit supporting the application for a search warrant showed nothing more than a call to Riley from Rodgers within an hour before his death, an anonymous tip that an unknown boyfriend of Riley's was involved in the murders, and a high volume of calls between Riley and Copeland. Based on the totality of the circumstances set forth in the affidavit, however, the magistrate was authorized to conclude that the facts stated in the affidavit linked Riley to one of the murder victims both before and around the time of the shootings, showed that she likely was evading the detective investigating the murders, closely linked Copeland's

15

cell phone to Riley's cell phone through frequent contacts that included calls before and after the murders, and placed Riley and Copeland in the same area as Copeland's house after the murders. The magistrate could infer from all of these circumstances a fair probability that Copeland's cell phone records contained updated contact information for Riley, as well as additional information about Copeland's contacts with her around the time of the crimes, which would lead to evidence relevant to the murders. See *Prince v. State*, 295 Ga. 788, 792-793 (764 SE2d 362) (2014) (holding that probable cause to search the defendant's house was established by information in affidavit that items belonging to the defendant's girlfriend were found near the murder victim's body, that a minivan matching the description of the girlfriend's minivan was near the crime scene before the body was discovered, that she left the state with the defendant after learning that investigators wanted to question her, and that she was at the defendant's house on the night of the murder and let him use her van). The "magistrate had a substantial basis for concluding that probable cause" therefore

existed to issue the search warrant for Copeland's cell phone records. *Johnson*, 310 Ga. at 694 (citation and punctuation omitted).

*Judgment affirmed.  All the Justices concur.*

Decided June 22, 2022.

Murder. Gwinnett Superior Court. Before Judge Hamil.

*G. Richard Stepp*, for appellant.

*Patsy Austin-Gatson, District Attorney, Christopher M. DeNeve, Lee F. Tittsworth, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.