**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0444
Kenneth Jackson
v.
The State

On Appeal from the DeKalb County Superior Court
No. 16CR2267

Decided: May 5, 2026

WARREN, Presiding Justice.

Kenneth Jackson was convicted of malice murder and other crimes in connection with the shooting death of nine-month-old KenDarious Edwards, Jr., and the non-fatal shootings of Tracy Smith, Tanyika Smith, and Teniqua Clark.[1] On appeal, Jackson

---

[1] The shootings occurred on May 10, 2014. In May 2016, a DeKalb County grand jury indicted Jackson alongside co-defendants Christopher Florence and Marco Watson, as well as Eunice English, who pleaded guilty to aggravated assault and kidnapping prior to trial. Relevant here, Jackson was charged with malice murder, felony murder predicated on aggravated assault, four counts of aggravated assault (one for each victim of the shooting), and three counts of violating the Street Gang Terrorism and Prevention Act ("Gang Act"). Jackson, Florence, and Watson were tried together before a jury from October 15 to 29, 2018, and Jackson was found guilty on all counts for which he was charged. Jackson was sentenced to serve life in prison without the possibility of parole for malice murder; 20 consecutive years for each of the aggravated assault counts against Tracy, Tanyika, and Clark; and 15 consecutive years for two of the three Gang Act counts, for a total sentence of life without parole plus 90 consecutive years. The felony murder count was vacated by operation of law; the aggravated assault count for Edwards merged

contends that the trial court erred in denying his motion for a directed verdict of acquittal; the evidence presented was not sufficient to sustain his convictions as a matter of constitutional due process; his trial counsel rendered constitutionally ineffective assistance in several respects; the trial court plainly erred in admitting evidence from unrelated gang investigations; and the trial court made an improper comment on the evidence and erred by denying his motion for a mistrial. Because the trial court did not err in denying the motion for a directed verdict of acquittal; the evidence was sufficient as a matter of constitutional due process; trial counsel was not deficient in any of the respects Jackson claims here; the trial court did not plainly err in admitting evidence from unrelated gang investigations; and the denial of Jackson's motion for a mistrial was not preserved for appellate review, each claim fails. We thus affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In May 2014, Tracy lived in DeKalb County with her daughters, Tanyika and N.J.; Tanyika's friend, Clark; and Tanyika's son, Edwards. Others would sometimes come to the house as well, including Tracy's son, Oslushla Smith, and Tanyika's friends, Kayla Dixon and Alexis Malone. Oslushla, Dixon, and Malone were in the Sex

---

with malice murder; and one of the Gang Act counts merged with another Gang Act count. (Florence was found guilty on all counts, and Watson was found not guilty on all counts except for two bifurcated counts for possession of a firearm by a convicted felon. Their cases are not part of this appeal.)

Jackson timely filed a motion for new trial in November 2018, which he amended through new counsel in November 2024. In July 2025, the trial court held a hearing on Jackson's motion and, in August 2025, both Jackson and the State filed supplemental briefing. On August 13, 2025, the trial court denied Jackson's motion. He timely filed a notice of appeal, and this case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

2

Money Murder ("SMM") gang.

Sergeant Matthew McLendon testified that in the early morning hours of May 10, 2014, Oslushla "lured" Malone into a field, shot her, and "crushed" her skull with a "large rock" or "cinder block," because he was concerned that she was going to "snitch" about a murder that he had committed one week prior. One of the State's gang experts, Agent Joshua Thompson, testified that according to gang protocol, Oslushla would have needed to obtain a "green light," or authorization, from a "higher up" in the gang before killing a fellow gang member. At the time of Malone's murder, that "higher up" was Jackson, who was also known as "KG," "Big Homie," and "Notorious." But because Oslushla failed to obtain this authorization prior to murdering Malone, he became "food" and was "put on a plate," which, according to Agent Thompson, meant he would be assaulted or killed by other gang members.

Dixon was present for Malone's murder, afterwards fleeing to Marco Watson's apartment where Devin Thomas—who was also an SMM member—was present. Dixon was "really frantic" as she told Watson and Thomas about Malone's murder. After hearing about what had happened, Thomas "felt somebody would have to get some get back for this."

Thomas testified that he then called a higher-ranking gang member, Christopher Florence, to tell him about Malone's murder and "see what [they were] going to do about the situation." Thomas's cell phone records showed that his phone placed a call at 12:01 p.m. to a phone number ending in -3508 (the "-3508 number"), which the evidence showed was associated with Florence. According to Thomas, Florence said that he would leave his home in Newnan for DeKalb County that afternoon.

Thomas testified that he also called Jackson, who at the

3

time was the "High 020"—one of the highest ranking members of SMM—"to let him know what was going on."[2] Thomas's cell phone records showed that he received an approximately five-minute call from a phone number ending in -6765 (the "-6765 number"), which the evidence showed belonged to Jackson, at 1:18 p.m. that day. Thomas, Agent Thompson, and Investigator Pinckney testified that although Jackson was incarcerated, he maintained his leadership position within SMM and communicated with other gang members using contraband cell phones, and Thomas testified that Jackson had used several cell phone numbers and "changed [them] rapidly."

Thomas testified that after he told Jackson about his desire to retaliate against Oslushla, Jackson encouraged him "to investigate" and "find [Oslushla]." He said, "You see him, y'all know what to do. Green light," which Thomas interpreted to mean "kill him." Several gang members went with Thomas to look for Oslushla, but they were unable to locate him. By then, Florence had arrived at his brother's apartment in DeKalb County, and Thomas went to meet with him.

Thomas testified that he and Florence called Jackson and had a "really short" discussion in which they informed Jackson that they could not locate Oslushla. Thomas's cell phone records reflected an approximately one-minute call to the -6765 number at 9:41 p.m. that night. The three men discussed Thomas and Florence going to Oslushla's family's home: if Oslushla was there, they would kill him; if he was not, they would "kill everybody in the house." After receiving the "green light" from Jackson for this

---

[2] Agent Thompson and Investigator Waine Pinckney, who also testified as a gang expert for the State, testified that the "High 020" was the highest-ranking member of the "Ruffsex" line of SMM and that Jackson held this position at the times relevant to this case.

4

plan, Thomas and Florence left the apartment and headed to Oslushla's family's home.[3]

Upon arriving around 10:30 p.m., Thomas and Florence kicked in the back door. Clark and Tanyika were awake at the time and ran to Tracy's room to alert her that "somebody [was] trying to get [them]." The intruders "chased down" Tracy, Tanyika, Clark, and Edwards, who locked themselves in Tracy's bathroom and hid in the bathtub. Moments later, the bathtub was riddled with gunfire. Nine-month-old Edwards was shot five times and died as a result. Tracy was shot in the right arm, both legs, and right knee; Tanyika was shot in the face, arm, chest, buttocks, and side; and Clark was shot in both legs. All three survived their injuries. Tracy testified that Oslushla, who was hiding out at a motel, was not home during the shooting. Tanyika later identified Thomas as one of the shooters.

Thomas testified that he and Florence returned to Florence's brother's apartment, where they disposed of their guns. Thomas called Jackson to inform him of what had happened. Thomas's cell phone records showed an approximately 30-second call to the -6765 number at 11:15 p.m. that night. Florence then took Thomas back to Watson's apartment and returned to his home in Newnan.

Thomas was interviewed by law enforcement and—as he admitted at trial—lied about his whereabouts on the night of the shooting. He was arrested and charged with making a false statement. While in prison, Thomas attempted to pass "kites," or jail notes using code words specific to SMM, to another SMM member to let him know that Jackson had approved the shooting. Thomas

---

[3] Data from Thomas's phone was consistent with the phone being turned off from 9:50 p.m. until 11:06 p.m.

wrote that he was in jail because Oslushla "killed one of our MOETs."[4] He noted that when he could not find Oslushla, he "shot up" Oslushla's family's house after getting "the green light from [Jackson]." Finally, he instructed the recipient of the notes to contact "big fool KG" to confirm that Thomas had followed gang protocol. The notes were turned over to law enforcement by another inmate.

Prior to receiving Thomas's jail notes, law enforcement was not aware of Jackson's potential involvement in the shooting. Based on the notes, investigators located a social media account they believed to be associated with Jackson. It contained photos of Jackson in prison displaying gang signs, posts mentioning SMM, comments asking "Big Homie" for his number or asking him to call the commenters, a comment wishing "Notorious" a happy birthday, and other gang-related activity.

When Thomas found out that law enforcement had his jail notes, he agreed to make a proffer and later pled guilty to his role in the shooting.[5] It was during this proffer that Thomas first implicated Florence. In an effort to corroborate Thomas's story, investigators obtained a search warrant for one of Florence's social media accounts, where they observed numerous photos of Florence making gang signs, as well as several messages mentioning his rank in SMM, his aliases, and his association with Jackson. Additionally, there were messages from the account in which the author told people to contact him at the -3508 number, including one message sent just four days before the shooting. Cell phone records for the -3508 number, which were introduced at trial,

---

[4] Thomas and Investigator Pinckney testified that a "MOET" is a female gang member of SMM.

[5] Thomas was sentenced to serve life in prison plus 20 years.

6

showed calls with Thomas's phone on the day of the shooting and calls with the -6765 number in the days following the shooting, and placed the -3508 number in DeKalb County immediately before and after the shooting.[6] After Florence was arrested and in the DeKalb County jail, he called his wife and dictated a letter for her to send to "Big Homie," which, as noted above, was a nickname from the social media account associated with Jackson.[7] In the letter, Florence told "Big Homie" that there was "a demon around [him] at [that] very moment who [was] telling the haters everything," but that Florence was "staying silent" and would "never fold."

In 2016, roughly two years after the shooting, investigators located a contraband cell phone in Jackson's prison cell. An extraction of the phone revealed, among other things, a message sent to the phone that was addressed to "Notorious." While the phone number did not match the -6765 number that communicated with Thomas on the day of the shooting, Investigator Pinckney testified that his investigation revealed that "Jackson had [used] different [phone] numbers at different times."

As part of an unrelated investigation, law enforcement performed a data extraction on the cell phone of Kevin Hambrick, another SMM member, which showed that the -6765 number was saved under the contact name "Notorious," which, as noted above, was one of Jackson's aliases. Hambrick's phone and the -6765

---

[6] Investigator RL Randolph testified about the -3508 number's location data on the day of the shooting. The phone was in Newnan from at least 7:00 a.m. until 2:05 p.m. Then, from 3:05 p.m. until 9:51 p.m., the location data was consistent with the phone being at Florence's brother's apartment. The phone did not communicate with cell towers between 9:51 p.m. and 10:39 p.m.–around the time of the shooting–which Investigator Randolph testified was consistent with the phone being turned off.

[7] Thomas also testified that Jackson was known as the "Big Homie."

number exchanged several phone calls and text messages just five days after the shootings.

2. Jackson contends that the trial court erred in denying his motion for a directed verdict of acquittal because the evidence was not sufficient to sustain his convictions under Georgia's accomplice-corroboration statute, which provides in pertinent part that in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient [to establish a fact]. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]" OCGA § 24-14-8. For the reasons explained below, this claim fails.

"The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Render v. State*, 320 Ga. 890, 894 (2025) (quotation marks omitted). In assessing the sufficiency of the evidence, we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. Id. at 894–95. "[I]n order to sustain a felony conviction under Georgia law, testimony by an accomplice to a crime must be corroborated by other evidence implicating the defendant." *McGarity v. State*, 308 Ga. 417, 420 (2020) (citing OCGA § 24-14-8).[8] Such corroborating evidence "must either directly connect

---

[8] We have said that "although Georgia law requires independent corroboration of an accomplice's testimony to secure a conviction, federal law does not require such corroboration and, thus, a failure to corroborate accomplice testimony does not offend constitutional due process." *Copeland v. State*, 314 Ga. 44, 48 (2022) (cleaned up). We have nevertheless applied the accomplice-

the defendant with the crime or justify an inference that he is guilty, and must corroborate both the identity of the defendant and the fact of his participation in the crime." *Bowdery v. State*, 321 Ga. 890, 896 (2025) (quotation marks omitted). It "may be circumstantial, it may be slight, and it need not of itself be sufficient to warrant a conviction of the crime charged." *Yarn v. State*, 305 Ga. 421, 423 (2019) (quotation marks omitted). "Nor must the corroborating evidence match the testimony of the accomplice in every detail." *Bowdery*, 321 Ga. at 896 (cleaned up). The relevant question is "whether there was at least slight independent corroborating evidence to support a finding that the defendant committed the crimes of which he was convicted." Id. (cleaned up).[9] "Once the State adduces such evidence, it is peculiarly a matter for the jury to determine whether the evidence sufficiently corroborates the accomplice's testimony and warrants a conviction." *Crawford v. State*, 294 Ga. 898, 901 (2014) (quotation marks omitted).

Jackson claims that Thomas's testimony was the only evidence of Jackson's participation in the shootings. Although he acknowledges that the State presented evidence of his gang membership and use of cell phones in prison, he argues that Thomas's

---

corroboration requirement in reviewing denials of a motion for directed verdict—see, e.g., *Render*, 320 Ga. at 895—and assume without deciding for purposes of our analysis that it applies here. See *Stitts v. State*, 323 Ga. 109, 112–13 (2025) (assuming that OCGA § 24-14-8 applied in a sufficiency analysis and concluding that it was satisfied).

[9] Although we conclude below that no evidence relevant to this analysis was improperly admitted by the trial court, we also note that "in considering sufficiency of the corroboration of an accomplice's testimony, we must consider all the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *Copeland v. State*, 314 Ga. 44, 47 (2022) (quotation marks omitted).

cell phone records do not sufficiently corroborate Thomas's testimony because the -6765 number "cannot be tied to Jackson with certainty," Thomas is the only witness who connected that number to Jackson, and other evidence connected Jackson to different cell phone numbers.

In so arguing, Jackson misapprehends the applicable legal standard: that there be "at least slight independent corroborating evidence," *Bowdery*, 321 Ga. at 896 (cleaned up), to support the jury's finding that Jackson was a party to the crimes of murder, aggravated assault, and violations of the Gang Act. See OCGA § 16-2-20 (describing when a person is a party to a crime). We conclude that the evidence in this case met that standard. As to the -6765 number belonging to Jackson, testimony from the State's gang experts, data extracted from the phone in Jackson's cell, and social media evidence showed that Jackson went by several nicknames, including "Notorious." Ample evidence also showed that Jackson had access to cell phones while he was in prison and that he used these phones to maintain communication with and authority over fellow gang members. Contrary to Jackson's assertion, there was independent evidence showing that the -6765 number belonged to him: the -6765 number was saved in SMM member Hambrick's phone under the contact "Notorious," and data from Hambrick's phone showed that he had been in contact with this number just five days after the shootings. Although there was also evidence connecting Jackson to other phone numbers, Investigator Pinckney testified that Jackson had used several phone numbers at "different times," which corroborated Thomas's testimony on the same point. Thus, the State adduced sufficient independent evidence from which a reasonable jury could infer that the -6765 number was used by Jackson at the time of the shooting.

10

As to Jackson's involvement in the shooting, Thomas's phone records showed that, in addition to calling the -6765 number on the day of the shooting before beginning his initial search for Oslushla, he also called the -6765 number both shortly before and shortly after the shooting, corroborating his testimony that he called Jackson before going to Oslushla's family's home to get the "green light" and afterwards to inform him the plan had been carried out. See *Crawford*, 294 Ga. at 902 (holding that phone record evidence was sufficient to corroborate accomplice's testimony despite the fact that the records "neither reveal[ed] the content of the [phone] conversations nor even confirm[ed] that [the appellant] himself, as opposed to some other person using his phone, was a party to the calls," where the evidence showed that the phone in question actually belonged to the appellant); *Threatt v. State*, 293 Ga. 549, 552 (2013) (concluding that accomplice's testimony was sufficiently corroborated because, among other things, phone records showed that the appellant and his accomplice were in contact before the crimes and in the hours afterwards). The State's gang experts testified that gang protocol required a leader of a certain rank to authorize the murder of a fellow gang member and that Jackson, who was the "High 020" of SMM, was the person with the necessary rank to give that authorization. This corroborated Thomas's testimony that SMM protocol required him to get the "green light" from Jackson before acting on his plan to kill Oslushla or anyone else in the house. The State's gang experts further testified that if a gang member did not get this authorization before killing another gang member, that person would be subject to retaliation, which corroborated Thomas's testimony that the shooting was a gang-motivated response to Oslushla having killed Malone, as Oslushla had not gotten the requisite authorization before killing Malone earlier that day. Finally, the State presented evidence of Florence's

11

jail call to his wife, made after he was arrested, in which he directed her to write a letter to "Big Homie," which was another nickname of Jackson's. In the letter, Florence said that there was "a demon … who is telling the haters everything," and assured "Big Homie" that Florence was "staying silent" and would "never fold." This evidence, albeit circumstantial, was independent of Thomas's testimony and sufficient for a reasonable jury to infer that Jackson participated in the murder of Edwards and the aggravated assaults of Tracy, Tanyika, and Clark, and violated the Gang Act in doing so. See *Bowdery*, 321 Ga. at 896–97 (concluding that cell phone records, evidence of the appellant's participation in the same gang as his accomplice, and testimony about the gang-related motive for the shooting provided at least slight corroboration of the accomplice's testimony and was thus sufficient under OCGA § 24-14-8); see also *Huff v. State*, 300 Ga. 807, 809 (2017) ("The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime." (cleaned up)).

3. Jackson relatedly argues that the evidence presented was insufficient to sustain his convictions as a matter of constitutional due process. We disagree.

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process under *Jackson v. Virginia*, 443 US 307, 318-19 (1979), we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found that defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Copeland v. State*, 314 Ga. 44, 47 (2022). "We leave to the trier of fact the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences

12

to be derived from the facts, and we do not reweigh the evidence." Id. (cleaned up). And when "we consider the legal sufficiency of the evidence under *Jackson v. Virginia*, we consider all the evidence presented at trial, without regard to whether some of that evidence might have been improperly admitted." Id. (quotation marks omitted).

Jackson claims that the evidence was "thin and circumstantial"; that Thomas was not a credible witness; and that without what he claims was improper hearsay testimony from the State's gang experts, the evidence was, at best, "anemic."

Viewing the evidence presented at Jackson's trial under the applicable legal standard and in the light most favorable to the verdicts, we conclude that the evidence presented was sufficient for "any rational trier of fact" to have found "beyond a reasonable doubt" the "essential elements" to support Jackson's convictions for malice murder, aggravated assault, and violations of the Gang Act. *Jackson*, 443 US at 319. The jury was authorized to accept Thomas's testimony as true, and between his testimony and the circumstantial evidence recounted above in Division 2, the evidence presented satisfies the due process demands of the United States Constitution. See *Moss v. State*, 323 Ga. 143, 146 (2025) ("[C]ircumstantial evidence alone can be constitutionally sufficient." (quotation marks omitted)); *Crawford*, 294 Ga. at 902 (concluding that accomplice's testimony and phone records were sufficient as a matter of federal due process to sustain the appellant's convictions). Accordingly, this claim fails.

4. Jackson contends that his trial counsel rendered constitutionally ineffective assistance because he did not properly prepare Jackson for trial or timely object to portions of Agent Thompson's testimony that Jackson claims were impermissible hearsay. As explained below, counsel did not perform deficiently, so each

13

claim fails.

To prevail on these claims, Jackson must establish that trial counsel's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Reddick v. State*, 321 Ga. 73, 81 (2025). To establish deficient performance, Jackson must show that trial counsel performed his duties "in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Reddick*, 321 Ga. at 81. This "is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably," and Jackson "bears the burden of overcoming this presumption." Id. (quotation marks omitted). "To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (quotation marks omitted). Moreover, "counsel cannot be deemed deficient for failing to make a meritless objection." Id. at 84.

To establish prejudice, Jackson "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Reddick*, 321 Ga. at 81 (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quotations marks omitted). We need not address both parts of the *Strickland* test if Jackson does not meet his burden of establishing one. See *Strickland*, 466 US at 697; *Reddick*, 321 Ga. at 81.

(a) Jackson asserts that his trial counsel performed deficiently in not adequately preparing him for trial and not taking more time to review the evidence with him prior to jury selection—specifically, the audio recording of Thomas's prior interview

14

with investigators. Because counsel's performance was objectively reasonable, he was not deficient, and this claim fails.

Prior to trial, Jackson was housed at the Georgia Diagnostic Prison in Jackson. The trial transcript shows that on the morning of jury selection, Jackson's trial counsel informed the trial court that because of security restrictions imposed by the Department of Corrections, counsel was not able to bring his laptop to meet with Jackson and had not been able to review certain digital discovery with him, including an audio recording of Thomas's prior interview with investigators. Counsel told the trial court that he was "ready to go forward with trial" and did not move for a continuance, but he requested that the trial court provide him extra time to meet with Jackson and review this evidence that day and over the course of trial. The trial transcripts show that the same evening—after jury selection but prior to the start of trial—counsel reviewed this digital evidence with Jackson. At the motion for new trial hearing, counsel testified that although he did not have as much time to "digest" and "plan" with Jackson as he would have liked because of the security restrictions, he had taken the following steps, among others, in preparing Jackson for trial: he copied the paper discovery for Jackson and reviewed it with him; he "thoroughly" reviewed the recording of Thomas's interview and "fully summariz[ed]" its contents in written notes, which he reviewed with Jackson at the Georgia Diagnostic Prison in advance of trial; he spoke with Jackson on the phone even when he was not able to visit him in person; and he reviewed the recording of Thomas's interview with Jackson on the evening before trial.

The record shows that counsel's efforts to meet and review discovery with Jackson prior to trial were objectively reasonable. Counsel visited Jackson at the Georgia Diagnostic Prison and

spoke with him on the phone several times prior to trial; provided copies of, and was able to review, all paper discovery with him; thoroughly reviewed Thomas's recorded interview several times and "fully summariz[ed]" its contents, which he shared with Jackson well before jury selection; and, at least before opening statements and the presentation of any evidence, listened to the recording with Jackson. We conclude that trial counsel's performance in reviewing the discovery with Jackson and preparing him for trial was objectively reasonable. See *Henry v. State*, 307 Ga. 281, 283 (2019) (concluding that trial counsel's performance was not deficient where he met with the defendant just once prior to jury selection and the defendant did not personally review the recorded interview of a key witness against him or the GBI's case file, but the record showed that counsel communicated with the defendant through other means and discussed the contents of the GBI case file with him). See also *Patterson v. State*, 314 Ga. 167, 173 (2022); *Mitchell v. State*, 279 Ga. 158, 160 (2005).

(b) Jackson contends that trial counsel was deficient for not making a hearsay objection to Agent Thompson's testimony about the proliferation of cell phones in Georgia prisons and by not making a timely hearsay objection to Agent Thompson's testimony about the history of SMM and the United Blood Nation ("UBN") gang, of which SMM was a subset. He claims such objections would have succeeded because Agent Thompson's testimony on these matters was based on information he learned from other people. Because a hearsay objection to this testimony would have been meritless, counsel was not deficient, and this claim fails.

Agent Thompson testified as an expert in criminal street

gangs and street gang activity.[10]  As to cell phones, Agent Thompson testified that they were being smuggled into Georgia prisons at an increased rate and that they allowed for inmates—and particularly gang members—to engage in criminal activity from prison.  He also described the methods by which cell phones were smuggled into prisons.  He testified that this information was based on cases he had worked on or assisted agents with at the

[10] Jackson asserts in passing, without any argument or citation to authority, that his trial counsel was deficient for not objecting to Agent Thompson's qualifications to testify as an expert.  It is not clear whether he attempts to assert that as an enumeration of error on appeal, but in any event, any such assertion would fail.  Agent Thompson testified about his training and experience as follows:  at the time of trial, he was the Assistant Special Agent in Charge with the Georgia Department of Corrections over the Special Investigation section and he was assigned to the FBI Safe Streets Gang Task Force; he had been in law enforcement in Georgia for 19 years; he was previously assigned to the U.S. Marshals Service Fugitive Task Force, where he helped start a gang unit and focused on "working gangs, getting intelligence, getting crimes, [and] getting fugitives"; he had been through over 100 hours of gang training, both at the state level and through the Department of Justice; he was a certified gang investigator with the Georgia Gang Investigator's Association; and he had interviewed over 500 gang members, listened to over 2,000 hours of gang members' jail calls, and listened to over 1,000 hours of wire-tapped conversations involving gangs.  Jackson's trial counsel examined Agent Thompson during voir dire before indicating that he had no objection to his qualifications as an expert.  And even if trial counsel *had* objected, the trial court would not have abused its discretion by overruling such an objection—especially "[g]iven the evidence of the agent's training, education, and considerable experience"—and "counsel cannot be deemed deficient for failing to make a meritless objection." Cf. *Reddick*, 321 Ga. at 85 (rejecting a similar claim under former OCGA § 24-7-707, which governed expert qualifications in criminal cases at the time of Jackson's trial but was repealed in 2022).  See also *Davis v. State*, 301 Ga. 397, 406–07 (2017) (noting that, to qualify as an expert under former OCGA § 24-7-707, "all that is required is that a person must have been educated in a particular skill or profession; his special knowledge may be derived from experience as well as study" (quotation marks omitted)).

17

Department of Corrections and other law enforcement agencies. Trial counsel eventually objected to this testimony on grounds of non-responsiveness, the narrative nature of the testimony, and relevance. The trial court overruled the objection but directed the prosecutor to "break up" his questions to prevent narrative testimony.

Later, Agent Thompson testified about the history of the UBN and SMM gangs. After establishing that he had worked on cases involving SMM in the past, Thompson testified about the founding, different "lines," and leadership structures of the gangs. He described how many of the prominent leaders in the gangs are incarcerated but still able to manage and control members who are not in prison. Thompson explained that he knew this information from gang member writings he had seized, interviews with gang members, and jail calls and wire taps that he had personally reviewed. After Agent Thompson provided this testimony, trial counsel objected on the basis of hearsay, and the trial court overruled the objection.

Jackson argues that trial counsel was deficient for not objecting to the cell phone testimony on the basis of hearsay and for not timely objecting to the gang history testimony on the basis of hearsay.

Trial counsel did not perform deficiently in failing to lodge a hearsay objection to Agent Thompson's cell phone testimony or in failing to lodge a timely hearsay objection to Agent Thompson's testimony about gang history, because the trial court would not have abused its discretion by overruling either of these objections. Even to the extent that Thompson's expert testimony was based on information beyond his own personal knowledge, Georgia law "allows experts to base their opinion testimony on inadmissible

'facts or data,' so long as these 'facts or data' are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Smith v. State*, 307 Ga. 106, 116 (2019) (quoting OCGA § 24-7-703 ("Rule 703")).[11]  Jackson does not dispute, "and we see no reason to doubt, that the sources on which" Thompson "relied as a basis for [his] opinions—including gang-related training, participation in gang-related investigations, information from other police officers, and conversations with gang members—are reasonably relied upon by gang experts," so the trial court would have been well within its discretion in overruling a timely hearsay objection to this testimony.[12] Id.  See *United States v. Steed*, 548 F3d 961, 975–76 (11th Cir. 2008) (concluding that even if expert officer's testimony was based on otherwise inadmissible hearsay, it did not violate Federal Rule

---

[11] OCGA § 24-7-703 says:

The facts or data in the particular proceeding upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Such facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

[12] Jackson points to *Cobb v. State*, in which this Court said that an expert "must base his opinion on facts supported by evidence in the case; he cannot base his opinion on what he has heard in private conversations with others." 283 Ga. 388, 391 (2008) (quotation marks omitted).  But that case was decided under the old Evidence Code, and to the extent it contradicts OCGA § 24-7-703, it has been abrogated by the current Evidence Code. See *Smith*, 307 Ga. at 117 n.14 (recognizing that, to the extent an old Evidence Code case contradicted Rule 703, it was abrogated by the current Evidence Code).

19

of Evidence 703 because "general training and experience, discussions with other law enforcement officers, participation in searches and arrests of criminal suspects, and literature about trends in law enforcement" are sources that are "reasonably relied upon by experts in the law enforcement field").[13]  Because the hearsay objections would have been meritless, counsel was not deficient in failing to lodge them.

5. Jackson contends that the trial court plainly erred under OCGA § 24-4-403 ("Rule 403")[14] by admitting a gang-related document found during the search of SMM member Cordarius Wyatt's bedroom and Agent Thompson's testimony as to that document, and by allowing Agent Thompson's and Investigator Pinckney's testimony about unrelated investigations into other SMM members.  For the reasons explained below, this claim fails.

At trial, Agent Thompson testified that Wyatt was arrested for murder in May 2014 while he was on parole.  As a part of his job, Agent Thompson searched Wyatt's bedroom after he was arrested and found a multi-page document with SMM's "history, their lingo, the protocol, who is in charge, and things to follow generally." When the State attempted to admit the document, Jackson's attorney objected on several grounds—but not on the

---

[13] "Rule 703 is substantially similar to Federal Rule of Evidence 703. We have explained that, when we consider the meaning of provisions in the [current] Evidence Code that are borrowed from the Federal Rules of Evidence, 'we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit.'" *Smith*, 307 Ga. at 116 n.13 (quoting *Olds v. State*, 299 Ga. 65, 69 (2016); citing *State v. Almanza*, 304 Ga. 553, 558 (2018)).

[14] Rule 403 says: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

basis of Rule 403—and the trial court overruled the objections. Agent Thompson proceeded to testify as to some of the document's contents.

Agent Thompson then made a brief reference to another SMM member, Brenton Carson, whose home had been searched, yielding three guns and "some drugs," and whose cell phone records also had been extracted by law enforcement officials. Agent Thompson testified that he found "a bunch of stuff" related to SMM on Carson's phone, as well as a phone number—but not the -6765 number—saved under "KG da god." As Agent Thompson began to describe another investigation into a separate murder alleged to have been committed by an SMM member, Jackson's trial counsel objected to the testimony as irrelevant and improper character testimony—but not on the basis of Rule 403. Before the trial court ruled, the State indicated it would not ask about the underlying details of the investigations involving other SMM members, but would instead focus on the cell phone record extractions that occurred as a result of those investigations that related to Jackson's case. Jackson's trial counsel agreed to this approach, stating: "[t]hat does let us move on."

As Jackson acknowledges, he did not object to this evidence recounted above on the basis of Rule 403, so we review his claim for plain error only. See *Talley v. State*, 314 Ga. 153, 160 n.12 (2022) ("Because [appellant] did not object to this evidence at trial under Rule 403 … our review of his claim of error on [that basis] is for plain error only."); OCGA § 24-1-103(d). To establish plain error, Jackson "must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Carter v. State*, 317 Ga. 689, 693 (2023) (quotation marks omitted). And

"to establish that the error affected his substantial rights, he must demonstrate that it caused him harm, meaning that the outcome of the trial court proceedings was likely affected." Id. (quotation marks omitted). "We need not analyze all of the elements of this test when, as in this case, the defendant has failed to establish one of them." Id. (quotation marks omitted).[15]

Pretermitting the other prongs of the plain error test, we conclude that Jackson has not carried his burden of demonstrating that the admission of this evidence "caused him harm, meaning that the outcome of the trial court proceedings was likely affected." *Carter*, 317 Ga. at 693 (quotation marks omitted). Jackson claims that this evidence was highly prejudicial, but does not explain how that was so. And in any event, the record shows otherwise. Any harmful effect that the document or Agent Thompson's accompanying testimony may have had was diminished because its pertinent contents—SMM's history, lingo, leadership, and protocol—were cumulative of testimony from Thomas, Investigator Pinckney, and Agent Thompson at other points during

---

[15] Jackson does not identify any testimony from Investigator Pinckney that he challenges under this enumeration and has thus failed to carry his burden of showing plain error with respect to the admission of that testimony. Additionally, Jackson conclusorily asserts that the evidence addressed above–relating to the gang document and other investigations–was "bolstering" and "impermissible hearsay" that should have been excluded under Rule 403. But he makes no argument in support, instead focusing his argument in this enumeration exclusively on Rule 403. It is unclear if he intends to assert such claims on appeal, but to the extent he does, he has failed to carry his burden of showing error. See *Williams v. State*, ___ Ga. ___ (2026), S26A0389, slip op. at 5 (Ga. Mar. 17, 2026) (2026 WL 739103) ("It is the appellant's burden to show error by identifying in the record the thing that he challenges on appeal and citing authority to show why that thing represents error."); *Jacobs v. State*, 306 Ga. 571, 575 (2019) ("[I]t is not this Court's responsibility to cull the record to find support for a defendant's claims.").

trial. See *Grier v. State*, 313 Ga. 236, 245 (2022) ("Appellant has not met his burden under the plain error standard to show a reasonable probability that the outcome would have been different, as the improperly admitted [evidence] was merely duplicative of other properly admitted evidence."); *Young v. State*, 309 Ga. 529, 538 (2020) (concluding that any harmful effect of evidence that the appellant claimed was improperly admitted was diminished because it was "cumulative of other properly admitted evidence"). Any such harm was likewise diminished because trial counsel made effective use of the document on cross-examination, eliciting testimony from Agent Thompson that it said "nothing … about this case," which fit into the defense's theory that although the State may have been able to show Jackson was a member of SMM, the evidence that he actually participated in the charged crimes was weak. See *White v. State*, 305 Ga. 111, 123 (2019) (concluding that the erroneous admission of certain evidence did not likely affect the outcome of the proceedings where "defense counsel was able to mitigate" any potential prejudice "by using the evidence … to [appellant's] advantage during his cross-examination").

As to Agent Thompson's testimony about Wyatt being involved in an unrelated murder and Carson possessing drugs and guns, it was very brief and merely provided background on how Agent Thompson came to obtain their cell phones to perform the extractions. Although Agent Thompson testified that Jackson, Wyatt, and Carson were members of the same gang, he did not testify that Wyatt's and Carson's respective cases were related to Jackson or that Jackson had any involvement in them. And the State made no argument about the underlying details of these investigations in opening or closing arguments. See *Smith v. State*, 322 Ga. 881, 885 (2025) (acknowledging that any harmful effect the challenged evidence may have had was lessened by the State

23

not mentioning it during opening, closing, or at other points during trial). Jackson therefore has not shown that the admission of this evidence likely affected the outcome of his trial and therefore "affected his substantial rights," so this claim fails. *Carter*, 317 Ga. at 693. See *Fox v. State*, 321 Ga. 411, 419 (2025) (concluding that appellant did not show that the challenged error likely affected the outcome of her trial and thus failed to show plain error).[16]

6. Finally, Jackson contends that the trial court made an improper comment on the evidence and erred by denying his motion for a mistrial. See OCGA §§ 17-8-57(a)(1) ("It is error for any

---

[16] Jackson appears to raise two other claims related to this evidence and Rule 403. First, Jackson asserts that this evidence was admitted at trial pursuant to OCGA § 24-4-418 ("Rule 418"), which provides that in criminal proceedings "in which the accused is accused of conducting or participating in criminal gang activity … evidence of the accused's commission of criminal gang activity … shall be admissible and may be considered for its bearing on any matter to which it is relevant," and, relying on our decision in *McKinney v. State*, 318 Ga. 566, 572 (2024), which held that evidence admissible pursuant to Rule 418 may nevertheless be excluded under Rule 403, that the trial court was required to sua sponte apply Rule 403's balancing test before admitting this evidence. As an initial matter, it is not clear from the record that Rule 418 was the basis for the admission of the challenged evidence here; the evidence does not involve Jackson's prior commission of criminal gang activity, and Rule 418 addresses "evidence of the *accused's* commission of criminal gang activity" (emphasis added). Nevertheless, for the reasons discussed above, Jackson has not shown plain error because he has failed to demonstrate that, even if the trial court erred by not applying Rule 403's balancing test to this evidence, any such error likely affected the outcome of Jackson's trial.

Jackson also asserts in passing that his trial counsel performed deficiently in failing to object to the admission of this evidence under Rule 403. Considering the above analysis, Jackson "has not established that any such deficiency resulted in prejudice, given that the test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review." *Clark v. State*, 315 Ga. 423, 442 (2023) (cleaned up).

24

judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused."); (a)(2) ("After [the party alleging a violation of paragraph (1) makes a timely objection], and if it is sustained, it shall be the duty of the court to give a curative instruction to the jury or declare a mistrial, if appropriate."). We conclude that this claim is not preserved for appellate review.

During Florence's counsel's cross-examination of Investigator Pinckney, counsel thoroughly questioned him about Thomas's cell phone records. Relevant here, counsel asked Investigator Pinckney about an alleged call from Dixon to Thomas on the day of the shooting. Investigator Pinckney asked if counsel could refresh his recollection as to Dixon's phone number so he could try to find it in the records, which he was able to review as he testified. Counsel responded: "No. I'm asking do you, as an investigator who's investigating this case, have a recollection of the phone number of the witness who sparked all of this?" Investigator Pinckney answered that he could not recall. The State objected on the basis that Florence's counsel was "saying [Dixon] sparked all this. He's putting that into evidence. That — that's not the evidence in this case." In other words, the State objected to counsel's insinuation that Dixon, who had witnessed Malone's murder and first reported it to Thomas, was the impetus behind the shooting. The trial court then said:

> I'm going to sustain the objection, but my normal position on that, the jury will remember what they did and did not hear during the course of the trial. But I think we — and I think in all fairness to any witness, nobody remembers every telephone number they may or may not have ever seen. So I'm going to

direct that if you're going to ask him about a particular number, you need [to] put a name with it or somebody with that, in all fairness.

Florence's counsel asked to be heard outside the presence of the jury and moved for a mistrial, which Jackson joined. Florence's counsel said that it was "unlawful for the Court to express or intimidate [sic] an opinion about anything related to the evidence, anything related to … the case that's before the jury." And "whether intentional or unintentional, the statement as to what somebody remembers or doesn't remember about a phone record constitutes a deviation from that rule." The trial court denied the motion for a mistrial but gave the following curative instruction to the jury:

> You are to try all facts and … you will make the ultimate decision on whether or not the State meets its burden of proof beyond a reasonable doubt. It is strictly within your province to make that determination, period.

None of the defendants, including Jackson, objected to the curative instruction or renewed their motion for a mistrial. Florence's counsel continued with his cross-examination.

To preserve the denial of a motion for a mistrial for appellate review after the trial court denies the motion and instead gives a curative instruction, the moving party must either object to the curative instruction as inadequate or renew the motion for mistrial. See *Robinson v. State*, ___ Ga. ___ (2026), S26A0282, slip op. at 1 (Ga. Mar. 3, 2026) (2026 WL 583026); *Bates v. State*, 317 Ga. 809, 818 (2023); *Hartsfield v. State*, 294 Ga. 883, 886 (2014). Here, after the trial court denied the motion for a mistrial and instead gave a curative instruction, Jackson did not object to

26

the curative instruction or renew his motion for a mistrial.  Thus, the claim is not preserved for appellate review.[17]  See *Robinson*,

[17] Prior to July 2015, OCGA § 17-8-57 provided, in relevant part, that "[s]hould any judge [in a criminal case express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused], the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below[.]" Relying on case law interpreting this pre-amendment version of the statute, Jackson asserts that the trial court's comment here automatically mandates a new trial.  See, e.g., *Patel v. State*, 282 Ga. 412, 415 (2007) ("[T]he law is well-established that instructions given to the jury by the trial court cannot cure a violation of OCGA § 17-8-57. … It follows that no waiver of this issue occurred when defense counsel failed to renew the motion for mistrial after the giving of legally-ineffective instructions.").

Importantly, however, the General Assembly amended OCGA § 17-8-57 effective July 1, 2015.  See Ga. L. 2015 at 1050. The statute now provides:

(a)      (1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.
(2) Any party who alleges a violation of paragraph (1) of this subsection shall make a timely objection and inform the court of the specific objection and the grounds for such objection, outside of the jury's hearing and presence.  After such objection has been made, and if it is sustained, it shall be the duty of the court to give a curative instruction to the jury or declare a mistrial, if appropriate.
(b) Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties.  Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as

2026 WL 583026 at *1; *Bates*, 317 Ga. at 819; *Hartsfield*, 294 Ga. at 886.[18]

*Judgment affirmed. All the Justices concur.*

---

such error affects substantive rights of the parties.
(c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

Thus, under OCGA § 17-8-57 (as amended in 2015), in situations like the one presented in this appeal, where a judge may have "express[ed] or intimate[d]" his opinion as to "whether a fact at issue ha[d] or ha[d] not been proved"—as opposed to a situation in which a judge had "express[ed] an opinion as to the guilt of the accused"—a new trial is no longer automatically required. Instead, in scenarios like the one presented here, a party must make a timely objection, and a trial court then has the discretion to issue a curative instruction or grant a mistrial. Cf. *State v. Cleveland*, 321 Ga. 375, 384–85 (2025) (holding that a new trial was required under OCGA § 17-8-57 when the trial court instructed the jury that the defendants were accomplices, thereby commenting on their guilt).

*Patel* relied on case law interpreting the pre-amendment language of the statute—which, as discussed above, always mandated a new trial—in concluding that curative instructions were per se legally inadequate such that a motion for a mistrial could not be waived even when a party failed to renew his motion after the giving of a curative instruction. See *Patel*, 282 Ga. at 415. But the amendment to OCGA § 17-8-57 added language expressly providing a curative instruction as a possible remedy for a court's expression of opinion as to whether a fact has been proven. In light of this amended statutory text, we conclude that *Patel* has been abrogated by OCGA § 17-8-57 on this issue.

[18] We pretermitted two trial court errors and assumed one trial counsel deficiency related to the introduction of Wyatt's gang document and Agent Thompson's testimony about investigations into other SMM members. For the reasons discussed above in Division 5, we conclude that Jackson "has failed to establish that the combined prejudicial effect of these [pretermitted] trial court errors and assumed deficient performance of trial counsel denied him a fundamentally fair trial." *Williams v. State*, 318 Ga. 83, 97 (2024). See *State v. Lane*, 308 Ga. 10, 23 (2020).